## MOUNT VERNON BREWING COMPANY *vs.* OSCAR TESCHNER.

*Competency of Evidence—Motion to Strike Out—Admissibility of News-
paper Reports to Prove Market Prices—Guaranty of Performance
of Assigned Contract—Time of Breach—Measure of Damages——
Instructions.*

If a witness testifies to certain facts; and it is *subsequently* developed that they were in writing, the trial Court may properly direct that such testimony be stricken out unless the writing is produced, or its absence accounted for in such way as to authorize secondary evidence, but the motion must then be so framed as to confine it to the objectionable testimony, and should not ordinarily be granted if it appeared when the testimony was offered that it was in writing but was not objected to at that time.

A motion to strike out the testimony given, without objection, in regard to correspondence and conversation between certain parties, is properly overruled if the evidnce relating to the conversations was admissible, although that relating to the correspondence was not. And if the letters referred to are afterwards put in evidence, no injury was done by the previous refusal of such motion as to the correspondence.

When the market price of a commodity in Baltimore at a certain time is

one of the questions in a case, a witness may be asked whether the price of the article in New York differs from its price in Baltimore. If the witness answers in the negative, one way of showing the market price in Baltimore is by proving what it was in New York.

The newspaper report of a market price of certain goods is admissible in evidence to show such price, when it is proved that the newspaper is accepted by parties trading in those goods as trustworthy in stating the market prices. In such case it is not necessary to show how the newspaper obtained the information so published. But if the newspaper in question is not recognized by the trade as furnishing reliable statements concerning the market prices, there must be evidence to show how its published information as to a particular m'  'ket price was obtained.

When there are no newspaper quotations of the market prices of an article in Baltimore, because it is not there generally dealt in, such quotations of its price in New York are admissible to show, in connection with evidence as to the cost of transportation, the value of the article in Baltime.

Defendant company assigned to plaintiff a contract it had with a third party calling for the delivery of a certain quantity of malt, but the malt was subsequently delivered to the Y. B. Company. *Held*, that the president of the defendant may be asked, "How did it happen this malt went to the Y. B. Company?"

When an exception is taken to the action of the Court in sustaining an objection to a question asked of a witness, it is not necessary to set forth in the record what his answer to the question would have been.

Defendant company having a contract with a third party for the delivery to it of a quantity of malt, to be shipped as ordered during season ending December 31st, 1907, assigned the same to the plaintiff, and also guaranteed the delivery of the malt in accordance with the contract as part of the agreement relating to the assignment. On March 11th, 1907, the defendant wrote to plaintiff that it declined to guarantee the deliveries of malt as per contract. On April 17th, the plaintiff demanded the malt from the seller. This was refused, the defendant company having previously notified the seller not to recognize the claim of the plaintiff. In an action for breach of contract, *held*, that, since the malt was to be shipped as ordered during the season ending December 31st, there was no breach of contract until the malt was ordered by the plaintiff on April 17th, and defendant was not liable before that time.

*Held*, further, that a prayer was properly rejected which declared that if the defendant notified the plaintiff on March 12th, that it would be unable to carry out the terms of the assignment, then the plaintiff's measure of damages is the difference between the contract price of the malt and its market price on March 12th, on which day plaintiff received notice that the defendant could not deliver the malt. This

prayer is erroneous, not only because the contract was not broken until the order for the malt was refused on April 17th, but also, because of a lack of evidence to support its hypothesis, since on March 12th, defendant had not notified the plaintiff that it would be unable to carry out the assignment, but only that it declined to guarantee the deliveries, and this it had previously done.

When a party assigns the contract under which he will be entitled to receive goods, and guarantees the delivery of the same to his assignee, he cannot be relieved from the obligation of this guaranty by a notice, prior to the time of delivery, that he declines to guarantee the delivery.

When defendant's evidence as to the terms of the contract sued on differs from that of the plaintiff, a prayer offered by the defendant based wholly upon his evidence and ignoring that offered by the plaintiff, is erroneous.

*Decided May 15th, 1908.*

Appeal from the Superior Court of Baltimore (SHARP, J.)

*Defendant's 3rd Prayer.*—If the jury shall find from the evidence that in the latter part of February nineteen hundred and seven or in the early part of March of the same year, the defendant company through its president, J. M. Jackson, assigned to the plaintiff an order on Newman & Company for fifteen thousand bushels of malt; and if they shall further find from the evidence that the consideration for the assignment of this order was the sum of nine hundred and seventy-five dollars in cash (or six and one-half cents a bushel on fifteen thousand bushels of malt) and if they shall further find that the said plaintiff promised to pay the said sum of nine hundred and seventy-five dollars in the course of two or three days; and if they shall further find that the said plaintiff from time to time promised to pay said sum of nine hundred and seventy-five dollars and that on or about the fourth day of March nineteen hundred and seven, the plaintiff delivered to the defendant a telegram of Elsas and Pritz, which was as follows: "Send contract the money will come," and if they should then further find from the evidence that the plaintiff did not pay said sum of nine hundred and seventy-five dollars within a

reasonable time thereafter; and if they shall further find that the plaintiff assured the defendant that he could sell the said benefit of said order to a New York friend and pay the said sum of nine hundred and seventy-five dollars by sight draft or cash forthwith, but did not tender the cash or sight draft to the defendant prior to the receipt of the cancellation of said assignment by the defendant's letter of March eleventh, nineteen hundred and seven, then their verdict must be for the defendant. (*Granted.*)

The cause was argued before BOYD, C. J., PEARCE SCHMUCKER, BURKE and WORTHINGTON, JJ.

*Joseph T. England* (with whom were *Dallett H. Wilson* and *Wm. C. Schmeisser* on the brief), for the appellant.

*Harman, Knapp, Ulman* and *Tucker* for the appellee, submitted the cause on their brief.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered against the appellant, in favor of the appellee, on a guarantee made by the former. On October 31st, 1906, the appellant entered into a contract with J. E. Newman & Co. of Pittsburg by which the latter sold to the former 15,000 bushels of fancy malt at 61 cts. per bushel, screened, f. o. b. cars, Baltimore,. "To be shipped in bags as ordered during season, ending December 31st, 1907." At the bottom of the contract there is written, "Deliver the within contract to Mr. Oscar Teschner or order," signed "Mt. Vernon Brewing Co., J. M. Jackson, Prest." The plaintiff testified that he had some conversation with Mr. Jackson in which the latter told him he had bought more malt than he wanted, and requested him to sell the fifteen thousand bushels for him. He declined to do that, but said that if the defendant would give him its guarantee for delivery of the contract of Newman & Co., he would pay it 67½ cts. per bushel, f. o. b. Baltimore, "which offer was accepted and the contract turned over to the plaintiff, properly transferred

and endorsed, and that the defendant gave him a guarantee in writing." The guarantee spoken of, which was dated March 8th, 1907, is addressed to the appellee, and is as follows: "We hereby guarantee the delivery of malt purchased from J. E. Newman & Co., Pittsburg, Pa., as per contract herewith enclosed," and is signed by the company through its president. The account filed, as the basis of this suit, was for the difference between the market value of the malt on April 18th, 1907, the alleged date of refusal to deliver, and the contract price (67½ cts. per bushel)—the account stating the market price to have been 95 cts. per bushel. The verdict was for $3,750, which indicates that the jury determined the market price to be 92½ cents per bushel.

I. In the course of the trial the defendant took nine exceptions. The first was from the refusal of the Court to grant a motion "to strike out all the testimony on the direct examination which was in regard to any correspondence or conversations had between the appellee and J. E. Newman & Co., that it be stricken out on the ground that the correspondence had not been produced and we have not had the opportunity to cross examine the witness on it." That motion was made while the plaintiff, who was the first witness, was on the stand. It could not prevail for technical reasons, if it had been otherwise proper. In the first place, it does not appear that any objection was made to the testimony when offered, and, then, a copy of the letter from J. E. Newman & Co. was introduced, without objection so far as the record discloses. If a witness testifies to certain facts, and it is *subsequently* developed that they were in writing, the trial Court may very properly direct that such testimony be stricken out, unless the writing is produced, or its absence accounted for in such way as to authorize secondary evidence, but the motion must then be so framed as to confine it to the objectionable testimony, and should not ordinarily be granted if it appeared when the testimony was offered that it was in writing, but was not objected to at the time. Then, this motion was too broad, as it not only included the copy of the letter spoken of, which had been ad-

mitted without objection, but it also included conversations. But in addition to that, the witness had testified that he had instructed his counsel to call upon Newman & Co. to deliver the malt, which was done about the 17th or 18th of April. The letters which passed between them were afterwards produced when Mr. Harman, who wrote them, was on the stand. So without further discussing this exception, we think it was properly overruled, and, even if there had been any error in the ruling, the subsequent production of the letters, which were those relied on, avoided any injury that the appellant might have sustained by their non-production.

2. The letter of the appellee's attorneys of April 17th, which was offered in evidence, shows that they notified J. E. Newman & Co. that their client was ready to pay for the malt on delivery, by giving his note for ninety days, as mentioned in the contract, or by payment of cash on receipt of car, and requested them to inform them when they would be ready to make the shipment. Newman & Co. replied on April 18th, "we are making deliveries against this contract. As far as Mr. Teschner is concerned, we know nothing about his transactions." On April 19th the attorneys again demanded of Newman & Co. delivery of the malt to the appellee, and informed them that unless there was prompt compliance with their request, they would institute proceedings to protect their client's interests, and on April 22nd wrote to the appellant that they had notified Newman & Co. that unless there was an immediate compliance with the order they would institute proceedings. The appellant had previously (March 11th) written to the appellee, who was then in New York endeavoring to sell the contract, that "from advices which we have received today from Pittsburg, we decline on any condition whatsoever to guarantee the deliveries of malt as per contract from J. E. Newman & Co. We therefore do not think it would be advisable to sell the contract."

The plaintiff produced as a witness Henry G. Remers, of Baltimore, who had been in the malt business for thirty years, including 1907. He had testified that the Journal of Com-

merce, which is published in New York, gives quotations of
the market prices of malt from day to day.   He was then
asked "does the price in New York differ from the price in
Baltimore?"   An objection to that question having been over-
ruled, an exception was taken, which is presented by the
second bill of exceptions.   If it is admissible to prove the
market prices of articles by newspapers, which we will con-
sider presently, we can see no objection to this question.   If
the witness had replied in the negative, one way of showing
the market price in Baltimore was by proving what it was in
New York.   But at any rate, it was simply leading up to the
more important questions which are presented by the third
and fourth bills of exception, and could not have injured the
appellant.

3. The witness answered the above question by saying, "I
couldn't say.   It may differ a cent or two on account of the
difference in the rate of freight, but I don't do any business
on the New York market, only here in Baltimore.   I can only
testify to the quotations for the city of Baltimore and Wash-
ington."   He said he considered the quotations in the New
York Journal of Commerce a good guide to go by, and that
it was entirely reliable.   The plaintiff then handed the witness
a copy of that paper dated March 11th, 1907, which he iden-
tified, and the plaintiff offered it in evidence, "and read from it
to the jury a quotation of season's contracts for malt at eighty-
five to ninety cents."   The defendant objected to the paper
being put in evidence and to reading the quotations, but the
Court overruled the objection, which ruling constitutes the
third bill of exceptions.   The fourth exception was to allowing
a copy of the paper of March 25th and those of April 15th,
April 25th and May 3rd were also mentioned, but the ques-
tion calling for them does not appear to have been excepted
to.   The defendant made a motion to have the newspapers
ruled out but it was overruled and the ruling constitutes the
fifth bill of exceptions.   We shall consider the third, fourth
and fifth together.

The precise questions involved in these exceptions have not

been passed on by this Court, although those more or less ana-
logous have been referred to. In *Munshower* v. *State*, 55 Md.
24, the question was whether Gruber's Almanac was admissi-
ble in evidence to prove the hour the moon rose on a certain
night, which it was conceded had become material and com-
petent for the State to show. In discussing the subject JUDGE
MILLER, who delivered the opinion, said, that "Courts have
received as evidence weather reports, reports of the state of
the markets, price currents, and insurance tables tending to
show the probable duration of human life, though these are
records which are not capable of mathematical demonstration,
which cannot be tested by any certain law, and which may or
may not omit the record of changes which have actually taken
place." In *Morris & Co.* v. *Columbian Iron Works*, 76 Md.
354, it was held that "lists" which were promulgated by an
authority which dealers in hardware recognized and followed,
could be used by witnesses to refresh their memories as to the
prices of certain articles—the witnesses having testified as to
the correctness of the lists and to the impossibility of any one
carrying all the prices in his mind. And in *Knickerbocker Ice
Co.* v. *Gardiner Dairy Co.*, decided at the last January Term,
107 Md., we quoted with approval from 2 *Wigmore on Ev.*,
sec. 2155, as to evidence of certain conversations by tele-
phone being sufficient to go to the jury "just as testimony
based on prices current is received (ante sec. 719)."

The rule is thus stated in 16 *Cyc.*, 1143: "The usual records
of sales or of offers to purchase or sell, such as newspaper mar-
ket reports or prices current, are deemed competent evidence
of market value, especially when accredited by the party
against whom they are offered. But prices current of dealers
or in newspapers must be shown to represent actual or pro-
posed transactions and it ought to appear that the prices were
promulgated from authoritative sources in good faith in the
usnal course of business." *Clicquot* v. *U. S.*, 3 Wall. 114, is
a leading case on the general subject. That was a proceed-
ing for the forfeiture of certain baskets of champagne, which
had been shipped from Bordeaux, France, on the ground that

the market value at the time and place when and where it was procured or manifested had been falsely stated, when entered at the office of collector of customs. A price current furnished by an agent of the claimant was held to be admissible, and also one that had been furnished to the witness by another house in Paris, at which he had inquired of the proprietor the wholesale prices of various wines. The Supreme Court in passing on the admissibility of the evidence referred to the statement in *Lush* v. *Druse*, 4 Wend. 313, that "The proof was by a witness who had inquired of merchants dealing in the article, and examined their books. This, uncontradicted, was sufficient;" and the Supreme Court then said, "With this ruling we are satisfied. While Courts, in the administration of the law of evidence, should be careful not to open the door to falsehood, they should be equally careful not to shut out truth. They should not encumber the law with rules that will involve labor and expense to the parties and delay the progress of the remedy—itself a serious evil—without giving any additional safeguard to the interests of justice. We think the price current is not liable to the objection that it was hearsay. It was prepared and used by the party who furnished it in the ordinary course of his business. It is as little liable to that objection as the entries in the books of the dealer, or his answers to the inquiries of a witness, both of which were admissible upon the authority of the case referred to in Wendell. It was clearly relevant. What effect it should have, in connection with the other evidence adduced by the parties, was a question for the jury." See also *Fenestein* v. *U. S.*, 3 Wall. 145.

The case of *Whelan* v. *Lynch*, 60 N. Y. 469, is much relied on by the appellant and has been cited with approval in other cases. It was there said: "The Court was also in error, I think, in admitting the shipping and Price Current List as evidence of the value of the wool, without some proof showing how or in what manner it was made up; where the information it contained was obtained, or whether the quotations of prices made were derived from actual sales, or otherwise. It is not

plain how a newspaper, containing the price current of merchandise, of itself, and aside from any explanation as to the authority from which it was obtained, can be made legitimate evidence of the facts stated.    The accuracy and correctness of such publications depend entirely upon the source from which the information is derived.    Mere quotations from other newspapers, or information obtained from those who have not the means of procuring it, would be entitled to but little if any weight.    The credit to be given to such testimony must be governed by extrinsic evidence, and cannot be determined by the newspaper itself without some proof of knowledge of the mode in which the list was made out." In *Fairley* v. *Smith,* 87 N. C. 367, the question was whether a witness, who had no knowledge on the subject excepting from what he had gathered from a daily newspaper, published in Charlotte, North Carolina, could testify as to the market value of cotton in Boston.    The Court very properly held that such evidence should have been excluded, under the circumstances in that case, and after citing a number of authorities said, "From this review of decided cases, it is plain the evidence received in the present case has none of those essential safeguards to insure the accuracy of the published information, as to the state of a distant market, to warrant its unqualified submission to the jnry.    It does not appear that business men acted upon this information, as truthful and correct, in their transactions with each other; nor from what source the information itself comes. *   *   *   We therefore think there was error in the admission of the evidence, thus obtained by the witness, and without any proof outside the paper of its trustworthiness and recognition, as such, by business men dealing in cotton." The citation from 1 *Wharton on Ev.*, sec. 674, is substantially to the same effect.

The decisions by the Supreme Court of Michigan have probably gone as far in admitting newspapers as those of any other Court in this country, as will be seen by reference to *Sisson* v. *Cleveland & Toledo R. R. Co.*, 14 Mich. 489; *C. & 7. R. R. Co.* v. *Perkins,* 17 *Ibid,* 296; *Peter* v. *Thickstun,* 51

*Ibid*, 589, and *Aulls* v. *Young*, 98 *Ibid*, 231. JUDGE COOLEY delivered the opinion in the two cases in Michigan first quoted above, and in Sisson's case he stated the general rule to be to "allow the market reports of such newspapers as the commercial world rely upon, to be given in evidence." It is undoubtedly the safe and proper rule to require some evidence to show either how the newspaper obtains its information, or that those dealing in the article in question rely on such newspaper for information as to its market value   It would not, however, reflect credit upon the law to hold that Courts should not admit, as *prima facie* evidence of market values of articles, newspapers which are accepted by those dealing in them as sufficiently accurate and correct to base their dealings on. This Court in *Munshower* v. *State, supra*, quoted from *Sisson* v. *R. R. Co.*, 14 Mich. 497, where JUDGE COOLEY said, "Courts would justly be the subject of ridicule, if they should deliberately shut their eyes to the sources of information which the rest of the world relies upon, and demand evidence of a less certain and satisfactory character." It is difficult to understand upon what principle "lists," "prices current" and similar evidence can be admitted, if a newspaper giving the market prices, which the particular trade relies on, cannot be. We are of opinion, therefore, that if it be shown that a newspaper offered in evidence is accepted by the trade as trustworthy and reliable in stating the market prices of the article in question, it should be admitted without requiring evidence of how the information published is obtained, but unless there is some testimony that it is so accepted by the trade, Courts should require evidence as to how the information was obtained by the publishers. Proper care on the part of the trial Court can generally avoid injury to the parties to suits, when such evidence is offered.

Applying that rule to this case, what does the record disclose? Henry G. Remers testified that he had been in the malt business for the last thirty years, that the Journal of Commerce gives quotations from day to day of the market prices of malt, and he considered it a good guide to go by

and entirely reliable.    On cross-examination, in answer to the
question whether it fixed the market price all over the coun-
try, he replied, "In New York State particularly, you may call
it for the whole east, the whole eastern section of that State."
On re-direct examination he testified that the Journal of Com-
merce "shows the market price of malt for the whole eastern
part of the country, but that there was a difference between
New York and Baltimore, on account of the cheaper freight
rate to Baltimore.    The difference in rate of freight is proba-
bly two cents."    He had, on cross-examination, been asked,
"Did you have any way or have you quotations in Baltimore
as to what it was worth?" and replied, "We have no quota-
tions in any newspaper here because they don't deal in malt
here."    He also spoke on cross-examination of the "Western
Brewery," which gave the quotations for the market in Chi-
cago.    If the inquiry had been directed to the market value of
malt in New York, there would seem to be no valid reason
why such a paper as the Journal of Commerce could not
be admitted, under the evidence of Mr. Remers.    The
comment of JUDGE COOLEY, quoted above, would be applica-
ble, if such testimony be rejected by the courts.

But in addition to the fact that the witness testified that the
Journal of Commerce showed the market value of malt for the
whole eastern part of the country, the rule is that: "Where it
is affirmatively shown that no market value for a commodity
exists at the place involved in the inquiry, market value at
other places may be shown, if these are sufficiently near to
show, in connection with cost of transportation, etc., the value
at the place in question, and if this market is one legally open
to the parties.    The question as to what places are sufficiently
near is addressed to the sound discretion of the Court, the de-
termining consideration being what evidence is practically
available to the litigants.    *   *   *   Market value in the
controlling market may always be shown, whatever its dis-
tance.    It is always open to a party for the purpose of im-
pairing the weight of evidence introduced by the opposite
party to assign and substantiate reasons why the market

price proved by his antagonist is unduly enhanced or unduly depressed." 16 *Cyc.* 1144. Among other cases cited is *Williamson* v. *Dillon*, 1 H. & G. 444, which sustains the text.

In this case the president of the defendant went on the stand, but did not attempt to show that there was any error in the figures stated in the Journal of Commerce, or in Mr. Remers' evidence, but said that he knew when he directed Newman & Co. to send the malt to the Yough Brewing Company (March 16th), the malt was worth more than 67½ cents, and Mr. Remers had previously testified that it did not go below 95 cents between April 15th and April 25th. As there was no evidence offered by the defendant to the contrary, it is difficult to see how it was injured—the verdict being, as can easily be calculated, on the basis of 92½ cents per bushel—even if there had been error, but we are of the opinion that the paper was properly admitted.

4. When the president of the defendant company was on the stand he testified that the Yough Brewing Company of Connellsville, Pa., got the malt in question, and that some of the stockholders in his company were also stockholders in that company. He was asked: "How does it happen that this malt went to the Yough Brewing Company of Connellsville?" An objection to that question having been overruled, the ruling forms the sixth bill of exceptions. It is not very clear whether that question was answered, but assuming that part of what subsequently appears in the record was intended as an answer to it, we find no error in that ruling. If its relevancy was not clear at the time the question was asked, it was made so when the defendant offered its third prayer, as that proceeded on the theory it had notified the plaintiff that it would be unable to carry out the terms of the order of assignment, while the president testified that he had "notified Newman & Co. not to pay any attention to any demand from Teschner."

5. Nor do we see any error in the ruling in the seventh bill of exceptions. The witness who was a bookkeeper for the appellant was handed what is spoken of in the record as a "letter," but was, as we understand, what we have referred to

as the "guarantee," and was asked why he dictated it. That was objected to and the objection was sustained. The appellee calls attention to the fact that the answer is not in the record, and hence argues that the exception cannot be entertained, but the question was not answered because the Court refused to permit it and therefore the rule stated in *King* v. *Zell*, 105 Md. 435, has no application. This Court overruled in *County Commissioners* v. *Gantt*, 78 Md. 286, previous decisions which had held that it would not consider an exception, unless the answer was in the record, although the answer had not been permitted to be given, and since then that has not been the rule of this Court when the question was not allowed. But we see no possible injury that the appellant could have sustained by this ruling, and we will not further discuss it.

6. The eighth exception was to granting the plaintiff's first and sixth prayers, and the ninth was for rejecting the defendant's second and fourth prayers. As they could have properly been included in one bill of exceptions we will consider them together. The appellant objects to the rulings on the prayers because the appellee had not proved a market price in Baltimore for malt, and therefore had shown no damages. The evidence we have referred to above will relieve us of further quoting from the record on this point. We think there was sufficient evidence to go to the jury, but there was no special exception to the plaintiff's prayers on the ground that there was no such evidence, and the defendant's second prayer submitted the same question, excepting it fixed March 12th, instead of April 17th, as the date of the alleged breach. Its fourth prayer had no application to this question.

Another ground relied on is that under the Maryland authorities the breach occurred on March 12th, by reason of the letter of the defendant, and not on or about April 17th, as stated in the plaintiff's prayers. *Williams* v. *Woods*, 16 Md. 220; *United Rys. R. Co.* v. *Wehr*, 103 Md. 323, and other cases are cited. There seems to be but little, if any, difference between the parties as to the rule of law which should govern, but they differ as to the time of the alleged breach. The ap-

pellant's second prayer thus refers to the question; "and if they shall further find that on the twelfth day of March, nineteen hundred and seven, the said defendant company notified the said plaintiff that it would be unable to carry out the terms of said order of assignment, then the measure of damages to which the plaintiff is entitled, if any, is the difference between the price agreed upon at the time of said assignment and the market price of this quality of malt on the twelfth day of March, nineteen hundred and seven, on which day he received notice from the defendant that the defendant company, through its president, could not deliver said malt." That refers we suppose to the letter of March 11th, but it does not support the prayer. It says "In reply we beg to say, that from advices which we have received today from Pittsburg, we decline on any condition whatsoever to guarantee the deliveries of malt as per contract from J. E. Newman & Co. We therefore do not think it would be advisable to sell the contract." It does not say that "it would be unable to carry out the terms of said order of assignment," but only that it declined to guarantee the deliveries of malt as per contract. It had already entered into the guarantee, and the plaintiff testified that it was a part of the original agreement—that the appellant was to guarantee delivery of the malt by Newman & Co. There was, therefore, no evidence to sustain that part of the prayer, and, being a rejected prayer, a special exception on that ground was not necessary to enable us to consider that omission.

But in addition to that, the appellant had assigned the contract with Newman & Co. to the appellee which provided that the malt was "To be shipped in bags as ordered during season, ending December 31st, 1907." There was therefore no breach until the malt was ordered by letter of April 17th, and hence the guarantor was not liable before that time. The appellee was not in a position to sue the appellant on its guarantee, until the order on Newman & Co. had been given. The authorities on the measure of damages, above cited, cannot be construed to authorize a guarantor to relieve himself of

his obligation by such a notice as the appellant gave the appellee. If it could, it would only be necessary in a fluctuating market for him to wait for a low price and give the notice. The fact was, as we have seen, not that it was unable to carry out the terms of the order of assignment, as stated in the prayer, but that it notified Newman & Co. not to pay any attention to a demand from the appellee, as the president claimed that the appellee agreed to pay the $975 within a few days after the contract was assigned to him, and having failed to fulfill his contract he notified Newman & Co. as above stated.

There may be some question as to the precise day of the refusal of Newman & Co. to furnish the malt. The appellee's prayer says "on or about the 17th of April." That was the day his first letter was written, Newman & Co's. letter was dated April 18th and the appellee's second letter on April 19th, but as the testimony offered by the appellee was that malt did not go below 95 cents per bushel between April 15th and April 25th the precise day between those dates was immaterial and, as we have seen, the verdict was at the rate of 92½ cents per bushel—allowing, we suppose, for the difference in freight which Mr. Remers spoke of.

The defendant's fourth prayer was clearly faulty. It asked the Court to instruct the jury, as a matter of law, that as there was no evidence to the effect that the plaintiff had tendered the defendant the difference between the price named in appellant's contract with Newman & Co. and the sum the appellee agreed to pay—amounting to $975—there had been no such performance or offer of performance of the contract as to entitle the plaintiff to recover, and the verdict must be for the defendant. But that entirely ignored the plaintiff's testimony, which was to the effect that he was not to pay that sum until he had made sale of the malt, and, although the president of the defendant denied that the Court could not grant such an instruction as the defendant's fourth prayer. The appellant got the benefit of all it was entitled to on that subject by its third prayer which was granted.

Finding no reversible error in the Court's rulings, either on the prayers or the evidence, the judgment must be affirmed.

*Judgment affirmed, the appellant to pay the costs, above and below.*