# DAVID W. JONES *vs.* WILLIAM ORTEL.

*Newspaper Report of Market Prices—Trover for Conversion of Shares of Stock—Instructions—Harmless Error.*

The newspaper report of the market prices of goods and stocks is admissible in evidence to show such prices when it is proved that the newspaper is accepted by the persons dealing in those things as trustworthy in stating the market prices. In such case, it is not necessary to show how the newspaper obtained the information so published. But if a newspaper is not recognized by the trade as furnishing reliable statements concerning the market prices, there must be evidence to show how its published information as to the particular market price was obtained, before it can be admitted in evidence.

When the evidence in the case is sufficient to show that at the time the plaintiff demanded from the defendant the return of his property, the latter had it within his power to return the same, then the refusal to do so is evidence of a conversion of the property by the defendant sufficient to support an action of trover.

Trover lies to recover damages for the conversion of shares of stock.

Plaintiff gave to defendant a certificate for forty shares of stock in a mining company, endorsed in blank, with directions to have it sold for not less than $13.50 per share. Subsequently the plaintiff demanded the return of the stock, without getting it. More than a year afterwards, the defendant offered to the plaintiff a certificate for forty shares of stock which had been issued in the defendant's name. Plaintiff refused to accept this. In an action of trover, alleging a conversion of the shares so delivered to the defendant, there was evidence tending to show that the defendant had sent the stock to a broker in New York, by whom it was sold after

plaintiff had demanded its return, and that the defendant had received the benefit of the broker's act. The trial Court instructed the jury that if they found that the plaintiff delivered the shares of stock to the defendant to be sold by him for the plaintiff at not less than $13.50 per share in cash, and that thereafter the plaintiff demanded the return of said stock or the said price thereof, and that the defendant refused to return the stock, then the plaintiff is entitled to recover such sum as the jury may find to be the value of the stock at the time of demand and refusal. *Held,* that the defendant is not entitled to except to this prayer on the ground that there was no evidence that he was directed to sell for cash, since a sale is presumed to be for cash unless otherwise provided.

*Held,* further, that although according to the evidence, the plaintiff demanded the return of the stock, and not the sum of $13.50 per share, the defendant was not injured by the assumption in the prayer that the plaintiff demanded either the stock or its said value.

*Decided November 30th, 1910.*

Appeal from the Baltimore City Court (ELLIOTT. J.).

The case was argued before BOYD, C. J., BRISCOE. PEARCE, SCHMUCKER, BURKE, THOMAS and PATTISON, JJ.

*Horton S. Smith,* for the appellant.

*William Colton,* for the appellee.

BURKE, J., delivered the opinion of the Court.

The appellee on this record recovered a judgment against the appellant in the Baltimore City Court, and this appeal, which is prosecuted by the defendant in that suit, brings up for review three exceptions reserved by the defendant during the progress of the trial. The suit is one in trover to recover damages for the conversion by the defendant "of

forty shares of the capital stock of the Mitchell Mining Company, a corporation" the property of the plaintiff, and of the value of thirteen dollars and fifty cents per share. The defendant pleaded *non cul* and *non detinet*. Issue was joined by the plaintiff upon the first plea, and by the defendant to the plaintiff's traverse of the second plea.

The plaintiff, William Ortel, on examination in chief testified that he was engaged in the grocery and provision business, and that the defendant, Dr. David W. Jones, had been for many years his family physician, and that he had bought through the defendant forty shares of stock of the Mitchell Mining Company at ten dollars per share. That he had received one certificate for these forty shares issued in his name. He further testified that in response to a message he called to see the defendant on March 1st, 1906, and that Dr. Jones then said to him, "now is the time for you to sell your stock," and that he replied, "if you think so all right;" that the Doctor said he had sold out that day, and thought best for me "to sell mine;" that he delivered his certificate to the defendant the next morning, and at the suggestion of Dr. Jones he endorsed the certificate "in order that it would not delay things in case they would be sold, they would not have to be returned from New York again;" that at the time he delivered the certificate he told the defendant that unless he got thirteen dollars and fifty cents per share not to sell; that in a few days after the delivery of the certificate, he met the defendant on the street and said to him "Doctor, I would like to have my stock. He said all right I will send for them. That was a few days after but I could not say what day, but I instructed him that I wanted my stock." He further said that later in the month of March he again asked the defendant about the stock, and was told by him that it was all right, and was well locked up, and that was all the satisfaction he could get; that he asked him for the stock at that time, but has never received

it; that in 1907 the defendant sent for him and he went to his home and the defendant said, "I do not understand it, Will, here is what they sent me," and showed a certificate for forty shares of stock of the Mitchell Mining Company issued in the name of the defendant. The plaintiff refused to accept the certificate. On cross-examination the plaintiff said he gave the stock to the defendant to sell, and that he supposed he would send it to New York to be sold, but instructed him not to sell unless he got thirteen and a half dollars per share; that he "got him to make a statement that he should go to work and get thirteen dollars and fifty cents to whoever it might concern." On the day that the stock was delivered the defendant, in the presence of the plaintiff, wrote the following letter to William G. Gallagher, a stock broker, in New York:

- "BALTIMORE, MD., March 2nd, 1906.

Dear Billy:—

I enclose certificate No. 1146 Mitchell Mining Company in the name of William Ortel. Please sell the same at 13½ to 14, not less than 13½. Please send receipt for same and oblige."

This is what the plaintiff referred to as the statement made by the defendant at the time the stock was delivered. The plaintiff said that he did not know at the time to whom the stock was sent, nor did he know as a fact that it was sent; that in 1907 after Doctor Jones had offered to give him the certificate referred to above, he ascertained the address of William G. Gallagher, and on October 23rd, 1907, wrote to him as follows: "Please send by mail William Ortel's old certificate of the Mitchell Mining Company, the old original certificate and no other." On November the 14th, 1907, he again wrote to Gallagher saying that he understood that his stock had been transferred on March 12th, 1906, and demanding the "certificate, or the amount with interest up to date." In explanation of these letters the plaintiff said his

object in writing them was to find out who really had the stock; that he wanted to avoid litigation and thought Doctor Jones should settle with him. He said he gave the stock to Doctor Jones to sell, but did not know whether it had been sold or not. He further testified that the defendant told him in October, 1907, when he showed him the certificate, that he had no stock of the Mitchell Mining Company.

The plaintiff then offered in evidence the files of the Baltimore News for the month of March, 1906, showing the quotations of prices of the stock of the Mitchell Mining Company from March 1st to March 15th. The defendant objected to the introduction of these files in evidence, and made a motion to strike out the newspaper quotations, but the Court overruled the motion. This constitutes the first exception. The testimony of Doctor Jones, the defendant, tended to show that he sent the certificate to Gallagher at the request of the plaintiff; that Gallagher had been doing a brokerage business in New York for him in connection with the Mitchell Mining Stock, and that the plaintiff told him to send the stock to Gallagher to sell; but that he wanted not less than thirteen and a half or fourteen dollars a share for it. He testified that it was possibly two months after the stock had been sent to Gallagher that he had his first conversation with the plaintiff, and that after that time he had several talks with him, and asked what he intended to do with his stock; and that the defendant "said he was not in the hurry to sell it as long as it did not bring what he thought he ought to get for it. He thought it would turn out all right in time. So the matter ran along then, for I expect a year or better, and the stock began to dwindle down all the time and I would often meet him. I had been attending to his family for a number of years and I would speak to him about it, and spoke to him several times on the street in reference to the matter, and he said he was perfectly satisfied, he wanted to know if I thought it was safe with Mr. Galla-

·gher, and I said, yes, that he had stock of mine and I felt
perfectly safe, that the forty shares were as safe as if we
·had them ourselves." The witness further said that in Octo-
ber, 1907, the plaintiff had again spoken about the stock,
and said he wanted the stock returned; that witness wrote
to Gallagher, and that he returned forty shares of stock is-
sued in the witness' name; that he had sent the stock "over
to Mr. Gallagher in Mr. Ortel's name, and the forty shares
were sent back in my name;" that he returned the certificate
asking that it be made out in Ortel's name, and that he told
the plaintiff that he did not understand why the shares sent
were in witness' name, and that Ortel then accused witness
·of selling his stock. He further testified that the plaintiff
did not know Gallagher, but that he asked the witness to
.place the stock in the hands of a broker to sell. William G.
·Gallagher, the broker to whom the certificate was sent, testi-
·fied that he received the certificate sometime after March
the 1st, and that it was enclosed in the letter, above quoted,
dated March 2nd, 1906; that that *particular certificate* was
not sold; but *"the stock was split up and transferred some-
time later."* Answering the question as to why it was spilt
up, the witness said: "Mr. Jones' stock account in my office
was handled exactly as my own. I mean by that that Mr.
.Jones has an account in the office, and he gave me permission,
if I saw anything cheap, to buy it, and sometimes I would
write that I was going to buy something, and sometimes I
would not, it all depended upon the speed necessary in the
·case. These particular forty shares of stock were trans-
ferred in another bundle of stock. Mr. Jones did not give
.any order for the sale of those forty shares." The witness
further said that he had no other order regarding the stock
than that contained in the letter of March 2nd, 1906, and
that the defendant did not know that the stock had been cut
up. He said Doctor Jones asked him to return the original
shares, and that he sent him forty shares in the defendant's

name.   "I returned a certificate for forty shares of stock for Doctor Jones, but that it was not the identical certificate in Mr. Ortel's name, because I could not return that, that had already been transferred."  He was then asked the following question to which the plaintiff objected, and the Court sustained the objection: "Was there any time when there was not forty shares there for Mr. Ortel?"  This ruling constitutes the second exception.   The witness subsequently testified that he never had an account for the plaintiff on his books.   With this outline of the material facts appearing in the record we will now consider the legal questions presented by the appeal.

There was serious error in permitting the introduction of the files of the *Baltimore News* to prove the value of the stock.   There was no foundation laid for the introduction of evidence of that character.   The mere fact that the *Baltimore News* contained quotations as to the value of the stock did not make those quotations admissible in evidence.   In the recent case of the *Mt. Vernon Company* v. *Teschner,* 108 Md. 158, the circumstances under which evidence of this nature may be admitted were fully considered.   After a full review of the authorities upon the subject, CHIEF JUDGE BOYD, speaking for the Court, said: "We are of opinion, therefore, that if it be shown that a newspaper offered in evidence is accepted by the trade as trustworthy and reliable in stating the market prices of the article in question, it should be admitted without requiring evidence of how the information published is obtained, but unless there is some testimony that it is so accepted by the trade, Courts should require evidence as to how the information was obtained by the publishers."  In the present case no attempt was made to comply with either of these conditions.   The mere fact of the publications seems to have been held sufficient for their introduction in evidence.   Apart from these files, there is nothing in the case to show the value of the stock at the time

of the alleged conversion, and, therefore, the ruling was both injurious and erroneous. The defendant was not injured by the ruling embraced in the second exception as it appears by a subsequent answer of the witness that he never had an account on his books with the plaintiff.

This brings us to the rulings upon the prayers and special exceptions. The Court granted the plaintiff's second prayer, and also granted the defendant's third and fourth prayers. It refused the defendant's second, fifth and sixth prayers, and overruled his special exceptions to the plaintiff's second prayer. The jury were instructed by the plaintiff's second prayer that if they found "that the plaintiff being the owner and in possession of forty shares of the capital stock of the Mitchell Mining Company, placed the same in the defendant's hands, to be disposed of by him for the plaintiff at the sum or price of not less than thirteen dollars and fifty cents, or fourteen dollars per share, in cash, and that thereafter the plaintiff demanded of the defendant the return of said stock or the price thereof at thirteen dollars and fifty cents or fourteen dollars per share, and that the defendant refused to return said stock unto the plaintiff, then the plaintiff is entitled to recover such sum as the jury may find to be the value of said stock at the time of such demand and refusal." This prayer was specially excepted to upon two grounds, first, that there was no evidence that the plaintiff instructed the defendant to sell for cash, and secondly, that there was no evidence legally sufficient to show that the plaintiff demanded of the defendant the return of the stock "or the price thereof at thirteen dollars and fifty cents, or fourteen dollars per share." As to the first ground of exception it is sufficient to say that under the facts stated the law presumed a cash sale. "In the absence of a special provision, or understanding to the contrary, a cash sale is generally presumed to have been contemplated." 24 *Am. & Eng. Ency. of Law,* 1095.

As to the second ground of exception it is conceded that the defendant never returned the stock nor did he ever pay

to the plaintiff the price thereof, and while it is true that the plaintiff never demanded, so far as the evidence showed of the defendant, the sum of thirteen dollars and fifty cents or fourteen dollars per share, it is not perceivable how the defendant was injured by the assumption of fact in the prayer. The plaintiff thereby undertook a greater burden than the law imposed upon him, and while the objection is strictly and technically well taken no possible injury resulted to the defendant by granting the prayer in the form in which it was offered. The plaintiff offered evidence tending to prove all the facts stated in the prayer, except the demand upon the defendant for the price of the stock, and as the case must be remanded for a new trial for error committed in the ruling on the first exception the defect complained of may be corrected, unless of course there be other and additional evidence introduced at the retrial of the case which would obviate this objection. The other facts stated in the prayer, and of which the plaintiff had offered evidence, if believed by the jury would have entitled him to a verdict. *Prima facie* a refusal to surrender upon demand by one entitled to possession makes the holding adverse; but the refusal is open to explanation. In *Dietus* v. *Fuss,* 8 Md. 158, it was said that conversion "may be the direct or constructive, and therefore may be proved directly or by inference. When the plaintiff fails in proving an actual conversion it will be necessary for him to give evidence of a *demand and refusal* having been made at a time when the defendant had the power to give up the goods. A demand and refusal are only evidence of a prior conversion, which may be explained or rebutted by evidence to the contrary." There were sufficient facts and circumstances in the case from which the jury might have found that in March, 1906, the defendant had it in his power to return the goods. He did not deny that at that time it was in his power to have done so, and the testimony of the plaintiff, which we have quoted, indicates that the defendant at that time had control of the stock. The

plaintiff's evidence was that the defendant said in response to his demand for the return of the stock, that it was "all right, and was well locked up." If the plaintiff's testimony be true, the stock was then in the possession of the *defendant's agent,* and no reason is shown why the defendant could not have had it returned. We therefore find no reversible error in granting the plaintiff's second prayer.

The defendant's second prayer asserted that under the pleadings the plaintiff had offered no legally sufficient evidence to entitle him to recover. This prayer raised the question of the legal sufficiency of the declaration, as the defendant was entitled to do by such a prayer under the case of *Ward* v. *Schlosser,* 111 Md. 532. The declaration, as we have seen, is for the conversion of "forty shares of the capital stock of the Mitchell Mining Company," and the contention is made, upon the authority of *Neiler & Warren* v. *Kelley,* 69 Pa. St. 403, that trover will not lie for the conversion of shares of stock. The declaration in that case, among other things, alleged the conversion of certain "shares of the stock" of two railroad companies. JUDGE SHARSWOOD said that, "trover can no more be maintained for a share of the capital stock of a corporation than it can for the interest of a partner in a commercial firm. The two cases are precisely analogous." He held that the declaration should have been for a conversion of the certificate of stock. It does not appear that this precise question has ever been directly passed upon by this Court; but a great weight of authority in other jurisdictions is against the Pennsylvania rule. In *Herrick* v. *Humphrey Hardware Company,* 73 Neb. 809, it was held that trover would lie for the conversion of shares of stock, and many authorities are cited to sustain the conclusion reached by the Court. Commenting upon the case of *Neiler & Warren* v. *Kelley, supra,* the Court said that that "decision dealt with so many judicial niceties that it found no favor either with the Courts generally or with the text

writers; and it is now almost universally held that the action will lie for the conversion of the stock itself, as well as for the conversion of the certificate which evidences it." In *Daggett* v. *Davis,* 53 Mich. 35, JUDGE COOLEY said: "We see no reason why, if the shares are converted by means of a wrongful use of the certificate, the owner in suing may not count upon the conversion of either." We hold the declaration good, and that the prayer was properly refused.

The defendant's fifth prayer was bad first, because it ignored the evidence of the plaintiff which tended to show that the stock was actually converted by the defendant's agent, and that the defendant received the benefit of his agent's wrongful act. There was evidence in the case from which the jury may have inferred that the defendant participated in Gallagher's act after the plaintiff had demanded the return of the stock. There was great conflict in the testimony of the plaintiff and the defendant; but these controverted questions of fact must be left to the jury under proper instructions. The defendant's sixth prayer asserted that there was no evidence of the time at which the plaintiff claimed the return of the stock. The testimony of the plaintiff, quoted in the early part of this opinion, sufficiently fixes the time of his demand upon the defendant for the return of the stock. This prayer was properly refused.

For error committed in the ruling which constitutes the first exception, the judgment must be reversed, and a new trial awarded.

> *Judgment reversed and a new trial award-*
> *ed, with costs to the appellant above*
> *and below.*