ALBERT BAUM ᴇᴛ ᴀʟ. *v.* STATE OF MARYLAND.
[No. 45, April Term, 1932.]

154

*Decided June 21st, 1932.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Samuel Greenfeld,* with whom was *William Greenfeld* on the brief, for the appellants.

*G. C. A. Anderson, Assistant Attorney General,* with whom were *Wm. Preston Lane, Jr., Attorney General, Herbert R. O'Conor, State's Attorney for Baltimore City,* and *Albert H. Blum, Assistant State's Attorney,* on the brief, for the State.

DIGGES, J., delivered the opinion of the Court.

The appeal in this case is from a conviction of the appellants of violation of section 247 of article 27 of the Code, which makes it unlawful for persons, associations, or corporations within the State of Maryland to "bet, wage or gamble in any manner, or by any means, or to make or sell a book or pool on the result of any trotting, pacing or running race of horses or other beasts, or race, contest or contingency of any kind, or to establish, keep, rent, use or occupy or knowingly suffer to be used, kept or rented or occupied, any house, building, vessel, grounds or place, or portion of any house, building, vessel, grounds or place, on land or water, within the State of Maryland, for the purpose of betting, wagering or gambling in any manner, or by any means, or making, selling or buying books or pools therein or thereon upon the result of any race or contest or contingency, or by any means

or devices whatsoever, to receive, become the depository of, record or register, or forward or purpose, or agree or pretend to forward any money, bet, wager, thing or consideration of value, to be bet, gambled or wagered in any manner, or by any means or device whatsoever, upon the result of any race, contest or contingency."

The indictment contained a number of counts setting forth the violation of the various provisions of the above statute, in order to meet the varying character of the proof which might be adduced at the trial. The indictment was against the appellants and one Frank Adler. Before the trial, Adler filed a motion to suppress certain evidence, and to have returned to him certain articles which in the petition were alleged to have been seized illegally. In this petition he set forth that the premises No. 129 West Mt. Royal Avenue belonged to him; that the articles and papers were seized by the police officers of the State of Maryland illegally and unlawfully and without a search warrant. This petition was overruled, whereupon Adler elected to be tried by jury, a severance was had, and the trial resulted in his acquittal. The other defendants, the appellants here, elected to be tried by the court sitting as a jury, and were found guilty and sentenced to suffer certain penalties.

The first contention is that, under the provisions of chapter 194 of the Acts of 1929, now section 4A of article 35, the articles, papers, etc., which were seized by the police, were taken in consequence of an illegal search and seizure. The provisions of the section relied upon are that "no evidence in the trial of misdemeanors shall be deemed admissible where the same shall have been procured by, through, or in consequence of any illegal search or seizure or of any search and seizure prohibited by the Declaration of Rights of this State; nor shall any evidence in such cases be admissible if procured by, through or in consequence of a search and seizure, the effect of the admission of which would be to compel one to give evidence against himself in a criminal case." This section has recently been construed by this court in the cases of *Heyward v. State*, 161 Md. 685, 158 A. 897, and *Gorman*

*v. State,* 161 Md. 700, 158 A. 903, 906. .Prior to the passage of chapter 194 of the Acts of 1929, the law was established, by previous decisions of this court, that evidence otherwise competent, pertinent, and admissible would not be rejected by reason of the method of its obtention, even though it was obtained through a search and seizure declared to be illegal by the Maryland Declaration of Rights and the Constitution of the United States. The former decisions were based upon the rule that, at the trial of cases, courts would not stop and permit a collateral issue as to the legality of the obtention of the evidence. The Act of 1929 effected a change in respect to misdemeanors. We are of the opinion that the provisions of chapter 194 do not apply to these defendants, for the reason that the immunity from illegal search and seizure is a privilege personal to those whose rights thereunder have been infringed, and they alone may invoke it. 56 *C. J.* 1174, 1175; *Silverthorne Lumber Co. v. United States,* 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319, 24 A. L. R. 1426; *Huhman v. United States* (C. C. A.), 42 F. (2nd) 733; *Coon v. United States* (C. C. A.), 36 F. (2nd) 164; *Simmons v. United States* (C. C. A.), 18 F. (2nd) 85; *Graham v. United States* (C. C. A.), 15 F. (2nd), 740, certiorari denied *O'Fallon v. United States,* 274 U. S. 743, 47 S. Ct. 587, 71 L. Ed. 1321; *United States v. Olmstead* (D. C.), 7 F. (2nd) 760; *United States v. Silverthorne* (D. C.), 265 F. 853; *State v. Hagan,* 47 Idaho, 315, 274 P. 628; *Snedegar v. State,* 196 Ind. 254, 146 N. E. 849, 147 N. E. 918; *Carter v. Commonwealth,* 234 Ky. 695, 28 S. W. (2nd) 976; *People v. Oaks,* 251 Mich. 253, 231 N. W. 557; *Cofer v. State,* 158 Miss. 493, 130 So. 511; *State v. Griffith,* 311 Mo. 630, 279 S. W. 135; *Chanosky v. State,* 52 Okl. 476, 153 P. 131; *Moody v. State,* 159 Tenn. 245, 17 S. W. (2nd) 919; *Aggers v. State,* 114 Tex. Cr. R. 391, 24 S. W. (2nd) 838. The reason for the rule is succinctly stated in *Guckenheimer v. United States,* 3 F. (2nd) 786, wherein it is said: "Certainly such a seizure, if unlawful, could not affect the constitutional rights of defendants whose property had not been seized or the privacy of whose homes had not been

disturbed; nor could they claim for themselves the benefits of the Fourth Amendment when its violation, if any, was with reference to the rights of another."

From the above authorities, and many others which might be cited, it is certain that one cannot complain of an illegal search and seizure of premises or property which he neither owns, nor leases, nor controls, nor lawfully occupies, nor rightfully possesses, or in which he has no interest. Or, stating it conversely, those whose private rights have been or may be disturbed alone may invoke the constitutional right against unreasonable search and seizure. The constitutional and statutory provisions against unwarranted searches and seizures are made in favor of the persons whose property or possessions are affected by such search and seizure.

The contention is also made by the appellants that evidence obtained by an illegal and unlawful search and seizure can properly be made the subject of objection when offered at the trial; and it is not necessary, as a preliminary, to file a petition for the suppression of the evidence and the return of the articles taken as a result of the illegal search and seizure. It is unnecessary to pass upon that question in this case. It is apparently the practice in the federal courts to file a motion or petition for suppression of the evidence before the trial, although recent decisions of the Supreme Court hold that this is a rule of practice, and is not of universal application. *Gouled v. United States,* 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647; *Amos v. United States,* 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654. It would seem that the individual's constitutional guaranties against illegal and unlawful search and seizure ought not to be made to depend upon a rule of practice which requires a preliminary motion for the suppression of evidence thus obtained.

In this case the petition of Adler states that the premises which were entered without a warrant were his premises; that is, that they either belonged to him or he was entitled to and had the possession thereof. There is no evidence of any claim whatever on the part of the appellants that it was their property or belonged to any one of them, or any claim

of ownership by them to any of the papers or articles seized by the police. Under such circumstances, objection, whether made by motion to suppress or at the trial of the case, cannot avail these appellants.

The facts as disclosed from the record are that Sergeant Hitzelberger, a member of the police force of Baltimore City, suspected that the law prohibiting betting or making pools on races was being violated at No. 129 West Mt. Royal Avenue; and, having this suspicion, he, on the afternoon of Saturday, November 21st, 1931, called a telephone number, Vernon 2954; he was told the line was busy, and then called Vernon 2539. Both of these numbers, according to the records of the telephone company, were the numbers of phones installed in 129 West Mt. Royal Avenue. The sergeant got some one at Vernon 2539, and asked him, "Who won the first race?" and was informed the race had been won by "Chamois." He then asked "what Chamois paid?" and was informed "six something." He then asked "if Bonnie Prince was running," and was told "Yes." "Then I asked, who is riding him? After I placed the bet I said I was Jake; he said, Jake what? And I hung the phone up after placing the bet; the party didn't ask me at first with whom he was talking, but after I placed the bet, he asked, who is it? Well, when I placed the bet of five first and five second on Bonnie Prince, he said, all right. He then asked who it was, and I said, Jake. He said, Jake who? I said, Jake, and then I hung up. But he didn't ask me before the placing of the bet who it was or anything else."

It was shown by the telephone company's employees that there were five telephones installed at 129 West Mt. Royal Avenue, and that the contract for one of the phones was signed with the name of William Lewis. Sergeant Hitzelberger further testified that he had been in the police department for twenty years, and had been working on handbook cases from time to time over that period; that ten minutes after he had the conversation over the telephone with some one at 129 West Mt. Royal Avenue he went to that place accompanied by other officers; that one officer was stationed

at the back door, and Hitzelberger and Sergeant Smith attempted to enter by the front door; they rang the bell and battered on the door for some twenty-five minutes, attracting a crowd, but were unable to gain entrance. Finally Sergeant Hitzelberger forcibly entered through a back window; he then let Sergeant Smith in the front door, and both proceeded to the second floor, which was barred by a door, fastened with two by four scantling. This door was opened by one of the defendants, William Lewis. When asked why he did not open the door, he said he had not heard anything. The officers then proceeded to the third floor, where the paraphernalia seized was found. They found a board about a foot square, with three sockets for three small lights similar to lights used on Christmas trees; there was opposite each light a telephone number; there were also three sockets for telephones and one pay telephone. In the room was a large table, chairs, a carton of lead pencils and some pads; these pads were ordinary scratch pads, six by three inches, marked off by three pencil lines drawn lengthwise. On the outside page of one of these pads was written what looked like "Dale Munson," followed by a long stroke and then the numeral one; on the next line was "Fall Apple 15," and a line and the numeral one; on the next line "Blue Damsel" two dash one. Hitzelberger testified that Fall Apple was a horse which was running in a race that day. The room was filled with smoke, the windows hooked, and the skylight was boarded. The smoke came from paper which had been burned in the bathroom and forced down the toilet. A slip was found which had fallen away from the burned paper, but was not destroyed, and on this slip was "4—1." Hitzelberger then testified as to the meaning of these numerals. On the fourth floor the defendants Baum, Kelly, and Rockwell were found playing cards, with their coats off. There were no other occupants in the house except a girl by the name of Kitty and the man Adler.

Twenty-four exceptions to rulings on evidence were taken during the trial. At the argument in this court it was stated by counsel that exceptions seven to ten and seventeen to nine-

teen were not pressed. The other exceptions are the basis for certain contentions made by the appellants, which will be considered in the order of those contentions. Having already disposed of those relating to the admissibility of evidence by reason of alleged illegal search and seizure, the next contention is that the opinion of Sergeant Hitzelberger as to the meaning of what was found on the slips of paper and pad was inadmissible unless supported by facts. It was shown that the police officer had been for many years on the force and had had large experience in dealing with and suppressing bookmaking; and we do not find any error in allowing his explanation as to what the slips which were found on the premises meant. *Nolan v. State,* 157 Md. 332, 146 A. 268; *Heyward v. State, supra.*

It is again contended by the appellants that reading from contracts not connecting the accused therewith is inadmissible. This proposition was raised by testimony of employees of the telephone company. The purpose of this testimony was not to prove the contents of the contracts, but to show that there were contracts for five telephones in the house in question, and in use, on the day of the raid. There was no error in admitting this testimony.

The question raised by the next exception to be considered is the contention that testimony as to a telephone conversation with an unidentified person is not admissible in evidence. The identity of the person answering the phone at the house in question, when called by Sergeant Hitzelberger, was not known to him, and no effort is being made to identify any of the appellants as being the particular person who talked with Hitzelberger. The purpose was to show that the police officer attempted to, and actually did, place a bet on a horse race with the person who answered the phone located at 129 West Mt. Royal Avenue. For this purpose it was admitted, and is not in conflict with the rule in *Archer v. State,* 145 Md., at page 149, 125 A. 744. See *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405; *Miller v. Leib,* 109 Md. 414, 72 A. 466.

There was introduced in evidence, over the defendants' objection, a race chart taken from the Baltimore Sunday Sun of November 22, 1931, which, according to the notation on the chart, was compiled by the Associated Press, and showed the horses which ran, and the results of the races, at Bowie, Maryland, on the previous day, which was the day of the raid in this case. According to this chart, the horse Bonnie Prince, upon which the sergeant testified he placed a bet, was shown to have run in the second race, and also Fall Apple and Blue Damsel; the latter two names having been found on some of the slips taken by the police from the premises where the appellants were arrested. We think this case is properly differentiated from the case of *Jones v. Ortel,* 114 Md. 205, 78 A. 1030, 1032, relied upon by the appellants. In that case, wherein the admission of the Baltimore News to prove the value of certain stock at a given time was held to be serious error, the court, speaking through Judge Burke, said quoting from *Mt. Vernon Brewing Co. v. Teschner,* 108 Md. 158, 69 A. 702: "We are of opinion, therefore, that if it be shown that a newspaper offered in evidence is accepted by the trade as trustworthy and reliable in stating the market prices of the article in question, it should be admitted without requiring evidence of how the information published is obtained, but unless there is some testimony that it is so accepted by the trade, courts should require evidence as to how the information was obtained by the publishers." Judge Burke then continues: "In the present case no attempt was made to comply with either of these conditions. The mere fact of the publications seems to have been held sufficient for their introduction in evidence. Apart from these files, there is nothing in the case to show the value of the stock at the time of the alleged conversation, and, therefore, the ruling was both injurious and erroneous."

It may be noted that the evidence objected to in that case, and held by this court to be inadmissible, was the sole evidence as to the value of the stock in question at the time of its conversion; and under those circumstances it was held

to be not only error, but injurious and reversible error, to admit the Baltimore News in evidence for that purpose, without first showing that it was accepted by the trade as trustworthy and reliable in stating the market prices, or producing evidence of how the information contained was obtained. In this case the purpose of the introduction of the racing sheet contained in the Baltimore Sunday Sun was not for the purpose of showing what was the market price of any commodity, or the amount which the winning horse paid in any race run on that day, but for the purpose of showing that there was a race run at Bowie in which were horses of the same names as found upon the slips and pads at 129 West Mt. Royal Avenue, and also the horse upon which the police sergeant had testified that he had placed a bet with some one located at this address; and, more particularly, it was not, as in the case of *Jones v. Ortel, supra,* the sole evidence, but was only cumulative of the evidence already given. Under such circumstances, we are clearly of the opinion that it was not reversible error.

There being no reversible error in any of the rulings excepted to, the judgment will be affirmed.

*Judgment affirmed, with costs.*