995 A.2d 694

**Alphonso GARNER**

v.

**STATE of Maryland.**

**No. 26, Sept. Term, 2009.**

Court of Appeals of Maryland.

May 18, 2010.

Piedad Gomez, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner.

Gary E. O'Connor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

MURPHY, J., which HARRELL, J., joins Part II only.

In the Circuit Court for Queen Anne's County, a jury convicted Alphonso Garner, Petitioner, of possession of cocaine with intent to distribute and related offenses. Although Peti-

tioner concedes that the State's evidence was sufficient to establish that he committed those offenses on the afternoon of June 22, 2006, he argues that there are two reasons why he is entitled to a new trial: (1) the Circuit Court erroneously admitted hearsay evidence of what was said by an unknown person who had placed a call to Petitioner's cell phone, and (2) the Circuit Court failed to comply with the requirements of Md. Rule 4–215 when ruling on Petitioner's request to discharge his trial counsel.

After those arguments were rejected by the Court of Special Appeals in *Garner v. State*, 183 Md.App. 122, 960 A.2d 649 (2008), Petitioner requested that this Court issue a writ of certiorari to answer four questions:

1. Did the Court of Special Appeals, purporting to rein in the "expansionist tide that produced" this Court's decisions in *Stoddard [v. State*, 389 Md. 681, 887 A.2d 564 (2005) ] and *Bernadyn [v. State*, 390 Md. 1, 887 A.2d 602 (2005) ], err in holding that an out-of-court statement by a non-testifying, unnamed caller to Petitioner's cell phone in which the caller said, "can I get a 40," was not hearsay?

2. Where Petitioner unequivocally expressed a desire to discharge counsel, the trial court ruled that he could do so, and the docket entry reads: "[c]ourt finds defendant has a right to proceed without counsel today and [attorney] may advise," did the Court of Special Appeals err in holding that counsel was not "discharged" for purposes of Rule 4–215, because Petitioner responded affirmatively when the trial court asked him, "[w]ould you like me to have him [the attorney] stay to be—sit next to you at the trial table to be on call if you need his help during the trial," and the attorney participated in all stages of the trial?

3. Is the State precluded from arguing that counsel was not "discharged" by the prosecutor's concession at the motion for new trial hearing that "the court allowed [the attorney] to stay to assist"?

4. Did the trial court fail to comply with the requirements of Maryland Rule 4–215?

That request was granted. 408 Md. 148, 968 A.2d 1064 (2009). For the reasons that follow, we hold that (1) the "out-of-court statement by a non-testifying, unnamed caller to Petitioner's cell phone in which the caller said, 'can I get a 40,' " was properly received into evidence, and (2) it is clear from a review of the trial transcript that Petitioner is not entitled to a new trial on the ground that a docket entry indicated a "finding" by the Circuit Court that Petitioner "has a right to proceed without counsel today and [Petitioner's trial counsel] may advise." We shall therefore affirm the judgments of the Circuit Court.

## Factual Background

### I.

The opinion of the Court of Special Appeals includes the following factual summary that is relevant to question 1:

At 3:45 in the afternoon on June 22, 2006, Trooper Jeremy Gussoni of the Maryland State Police and Scott Myers, a State Police Academy candidate, stopped the appellant, who was driving on U.S. Route 301 in Queen Anne's County, for no less than three minor traffic infractions. As they approached the appellant's stopped car, they heard him yell into a cell phone that he had been "profiled." The appellant immediately handed Trooper Gussoni an identification card and volunteered that his driver's license had been suspended. Trooper Gussoni verified the fact that the driver's license had been revoked. Trooper William Heath arrived on the scene and arrested the appellant for driving on a revoked license. A search incident to the appellant's arrest revealed 13 individually wrapped baggies containing what turned out to be cocaine "secreted in the vehicle's glove box, inside a fuse box." The aggregate weight of the cocaine was 6.9 grams.

183 Md.App. at 125–26, 960 A.2d at 650–651.

According to Petitioner (in the words of his Petition):

This case presents "a fascinating evidentiary issue," as described by the Court of Special Appeals. At the police station, Mr. Garner was stripped of his personal items, including his cell phone. Trooper Gussoni subsequently answered the cell phone. Gussoni was allowed to testify, over objection, that after he said "hello" a male caller replied, "can I get a 40," and then hung up when asked his name. The State relied upon the caller's utterance to characterize Petitioner's possession as commercial in nature and not as simple possession for personal use. During opening statement, the prosecutor told the jurors that the caller "said he needed a 40 . . . you'll hear from Corporal Michael a 40 is slang for a $40 piece of cocaine." During closing argument he told the jury, "why pr[ay]-tell [sic], would you call [a] user and ask him for a 40. Because he is not a user." And during rebuttal he told the jury, "[b]ut I keep coming back, I know I said this before, you do not, you do not ca[ll] [a] user a mere user of cocaine and ask him for a 40." The question before this Court is whether the utterance, "can I get a 40," which the State offered to prove that Petitioner was a dealer, was hearsay.

The record shows that the following transpired during Trooper Gussoni's direct examination:

Q While you were filling out your paperwork, back in the trooper's room, what happened?

A While I was typing, Mr. Garner's cell phone—the cell phone I received off of him, was ringing non-stop. I had spoken with his girlfriend earlier, I was figuring she might be calling him, wanting to know what's happening, not knowing if he's allowed to keep his cell phone on his person.

Q What happened when you noticed the phone ringing?

A Again, it was just continually ringing, ringing. I picked up the telephone and said hello. On the other line was a male voice. He said—

MR. ANDERSON: Objection, Your Honor, as to what the other—as to what the voice on the other line said. Objec-

tion as to what the voice on the other line said and I believe that might be hearsay, Your Honor.

THE COURT: Overruled.

BY [STATE'S ATTORNEY]:

Q You can answer.

A On the other line was a male voice, sounded like a male. I said hello. He said, yo, can I get a 40. I asked his name, he then hung up the telephone.

Q Did you tell him who you were?

A Not that one, but that phone was ringing off the hook.

Q Is that the only time you answered it?

A I answered it twice, the next one was a female. After that, another member of the drug task force answered the phone.

## II.

The following factual background is relevant to questions 2, 3, and 4:

Petitioner's initial appearance before the Circuit Court occurred on September 8, 2006. On October 10, 2006, Curt Anderson, Esq. entered his appearance as Petitioner's privately-engaged trial counsel. When Petitioner's case was called for trial, on November 30, 2006, Mr. Anderson informed the Circuit Court that Petitioner "doesn't think that I have his best interests at heart with regard to this case," and Petitioner stated to the Circuit Court that defense counsel "is trying to force a plea, make me take a plea that I don't want to take." The Circuit Court stated to Petitioner, (1) "I'm not going to make you take a plea," and (2) "I'm not going to postpone this case." The following transpired at this point:

THE COURT: Are you going—do you want to discharge him, is that it?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Would you like me to have him stay to be—sit next to you at the trial table to be on call if

you need his help during the trial? What I'm saying is we are going to have a trial today.

THE DEFENDANT: Is there any kind of way I can discharge him from representing me?

THE COURT: I said you can do—you have an absolute right to represent yourself, if you want to. You have an absolute right to get an attorney. You can't wait until the day of trial and come in and tell me that you are going to fire your attorney.

THE DEFENDANT: Well, I didn't know to go to—

THE COURT: What?

THE DEFENDANT: I didn't know who to go to to let anybody know, know what I mean, what kind of situation it was. My best interests was to come to the judge that's hearing the case and let him know that I don't—

THE COURT: I don't have anything to do, you chose the attorney. If you had problems, you had to work it out with him. Mr. Anderson is a member of the bar, I'm sure if you told him what your feelings were, I'm sure he would have done something about it.

THE DEFENDANT: I have told him.

THE COURT: What?

THE DEFENDANT: He can sit there.

THE COURT: Okay. Thank you. Go ahead.

The following transpired when the jury panel entered the courtroom:

MR. ANDERSON: **I'm still in the case** and on Mr. Garner's behalf, I want to make a motion here, not in the presence of the jury, to dismiss this jury pool as not being representative of Mr. Garner's peers.

(Emphasis supplied). That motion was denied, and jury selection followed, during which the following transpired:

THE COURT: Thank you. Mr. Anderson, would you stand up, please. Does any member of the prospective panel know Mr. Curtis Anderson, the attorney for the defendant

in this case? I see no responses. Mr. Anderson, would you introduce your client, please.

MR. ANDERSON: Stand up.

THE COURT: Turn around and face the jury. Does any member of the prospective panel know Mr. Alphonso Garner, the defendant in this case? You may have a seat, Mr. Garner. Do you have any other witnesses you'd like to introduce?

MR. ANDERSON: I do have one, Your Honor.

THE COURT: Yes.

MR. ANDERSON: Would Tina Brisco please stand up. Come forward, please. You can stand right there.

THE COURT: Does any member of the prospective panel know this young lady. I see no responses. You may sit down. Thank you. Anyone else?

MR. ANDERSON: No, sir.

THE COURT: All right. You may have a seat.

The following transpired at the conclusion of the jury selection process:

THE COURT: Is the jury as seated acceptable to the State?

[STATE'S ATTORNEY]: Yes, Your Honor.

THE COURT: To the defense?

MR. ANDERSON: Yes, Your Honor.

\* \* \*

THE COURT: ... Swear the jurors. Everything okay with you?

[STATE'S ATTORNEY]: Yes, Your Honor.

THE COURT: Mr. Anderson?

MR. ANDERSON: Yes. Thank you, sir.

The following transpired at the conclusion of the prosecutor's opening statement:

THE COURT: Yes, Mr. Anderson.

MR. ANDERSON: Thank you, Your Honor.

THE COURT: I also note that, for the record, your objection to the portion of the opening statement that dealt with the matter that we discussed at the bench. I saw you stand up.

MR. ANDERSON: Yes, sir.

THE COURT: But then you saw that I saw it. I just wanted to put it on the record.

MR. ANDERSON: Thank you, Your Honor.

THE COURT: You did make the objection. Go ahead.

MR. ANDERSON: Good morning. My name is Curt Anderson. I'm the attorney for Mr. Garner. Mr. Garner is seated right here. First, what I'd like to do is thank you all for being here today.

As noted by the Court of Special Appeals:

Mr. Anderson professionally and ably conducted the complete defense of this case from start to finish. He conducted the voir dire examination of the prospective jurors and then selected the jury. He made a motion in limine. He delivered the opening statement. He cross-examined the State's witnesses and made objections. He called the [Petitioner's] girlfriend as a defense witness. He made motions, at the end of the State's case and at the end of the entire case, for a judgment of acquittal. He delivered a closing argument. He referred to the [Petitioner] as "my client." The State referred to him as "counsel": "Your Honor, I'm going to file the additional penalties I previously served on counsel, subsequent offender notice." He represented the appellant at sentencing. He filed and argued a new trial motion....

\* \* \*

From the opening gavel through the conclusion of the motion for a new trial, there was never the remotest indication that Mr. Anderson was not full-fledged counsel for the defense. The appellant himself did not actively participate

in the conduct of his trial in any way nor did he protest his passive role.

183 Md.App. at 133, 960 A.2d at 655.

## Discussion

### I.

 Petitioner cites *Stoddard v. State*, 389 Md. 681, 887 A.2d 564 (2005) and *Bernadyn v. State*, 390 Md. 1, 887 A.2d 602 (2005) in support of his argument that the Circuit Court should have sustained the "hearsay" objection to Trooper Gussoni's testimony about the call to Petitioner's cell phone. Although those cases hold that certain "implied assertions" constitute hearsay evidence as that term is defined in Md. Rule 5–801(c),[1] neither *Stoddard* nor *Bernadyn* presented the issue of whether the "verbal part of an act" is subject to exclusion under the rule against hearsay, or the issue of whether the rule against hearsay is applicable to every out-of-court declaration that constitutes circumstantial evidence of the declarant's state of mind.[2] We need not either reaffirm or

---

1. In *Stoddard*, the out-of-court declaration was uttered by an 18 month old child who asked her mother, "is [the defendant] going to get me?" The State argued to the jury that this question proved that the child was an eyewitness to a murder committed by the defendant. Although all seven judges of this Court agreed that the Circuit Court should have excluded testimony about that question, only four agreed that "implied assertions" should be excluded under the rule against hearsay.

2. In *Connor v. State*, 225 Md. 543, 171 A.2d 699 (1961), while affirming a murder conviction, this Court rejected the defendant's argument that the victim's "dying declaration" should have been excluded for lack of a foundational showing of her awareness that death was near and certain. The victim in this case was Mrs. Connor, who stated to a police officer, "It was no accident," when the officer asked her, "Was this an accident or was it deliberate?" To establish that the victim was fully aware of her impending death at that point in time, the State presented testimony that, just before answering the officer's question, she said, "get a priest," and "take care of my baby." While rejecting the argument that a dying declaration is inadmissible unless it is preceded by the victim's acknowledgment that he or she is unlikely to survive, this Court stated:

overrule either of those fact-specific cases in order to hold that the rule against hearsay was not violated by Trooper Gussoni's testimony about the telephone call at issue.

■ When a telephone is used to receive illegal wagers or to receive orders called in by persons who wish to purchase a controlled dangerous substance, the telephone becomes an instrumentality of the crime. As the Court of Special Appeals stated:

> The making of a wager or the purchase of a drug, legally or illegally, is a form of contract. *Little v. State,* 204 Md. 518, 522–23, 105 A.2d 501 (1954). There is an offer and an acceptance. The telephoned words of the would-be bettor or would-be purchaser are frequently categorized, therefore, as verbal parts of acts. They are not considered to be assertions and do not fall under the scrutiny of the Rules Against Hearsay.

183 Md.App. at 140, 960 A.2d at 659. We agree with that analysis, which is entirely consistent with the prior opinions of this Court.

In *Baum v. State,* 163 Md. 153, 161 A. 244 (1932), while affirming gambling convictions based in part on a Sergeant's testimony that he placed a bet on a horse race by calling the number of a telephone proven to have been installed at the residence of one of the defendants, this Court explained why that testimony was admissible even though the witness did not know the identity of the person who took the bet:

> The question raised by the next exception to be considered is the contention that testimony as to a telephone conversation with an unidentified person is not admissible in evidence. The identity of the person answering the phone at the house in question, when called by Sergeant Hitzelberger, was not known to him, and no effort is being made to

---

Her anguished entreaty that someone take care of her baby plus the fact that she called for a priest before making the declaration was strong evidence that she was aware of her condition.

225 Md. at 551, 171 A.2d at 703. Neither *Stoddard* nor *Bernadyn* overrules *Connor.*

identify any of the appellants as being the particular person who talked with Hitzelberger. The purpose was to show that the police officer attempted to, and actually did, place a bet on a horse race with the person who answered the phone located at 129 West Mt. Royal Avenue.

*Id.* at 160, 161 A. at 247.

In *Courtney v. State,* 187 Md. 1, 48 A.2d 430 (1946), this Court affirmed bookmaking convictions based in part on a Baltimore City police officer's testimony that, during the execution of a search warrant at a premises used by the defendants, he answered the telephone and received bets from unidentified persons. While holding that the Circuit Court correctly overruled hearsay objections to that testimony, this Court stated:

The appellants earnestly contend that evidence as to the placing of bets over the telephone with Officer Trencamp was inadmissible, because the bettors were not identi- fied.... In *Beard v. United States,* 65 App. D.C. 231, 82 F.2d 837 [ (1936) ], officers overheard bets being called in by telephone. The court said (65 App. D.C. at page 235, 82 F.2d at page 841): "The case, therefore, is not one in which evidence of a telephone conversation is introduced against a particular person. In such case, it is, of course, necessary to establish the identity; but here the evidence, as we have seen, was offered to show that the place in question was a gambling place and that some or all of the persons found therein were engaged in taking bets in violation of law. For these purposes it was proper." Similar questions have been considered by the California courts, where it has been held that bets called in during a raid constitute a part of the *res gestae.* See *People v. Reifenstuhl,* 37 Cal.App.2d 402[,405], 99 P.2d 564[, 566 (1940) ]; *People v. Kelley,* 22 Cal.2d 169[, 176], 137 P.2d 1, 5 [ (1943) ]; and *People v. Klein,* 71 Cal.App.2d 588[, 591–592], 163 P.2d 71, 73 [ (1945) ].

187 Md. at 5–6, 48 A.2d at 432.

In *Little v. State,* 204 Md. 518, 105 A.2d 501 (1954), the proprietor of a Cumberland pool room who was convicted of

gambling violations argued that the State's *admissible* evidence was insufficient to establish that he maintained a premises for the purpose of accepting bets on horse races, and that the Circuit Court should have prohibited the State from presenting evidence that two State Police plainclothes officers went to the pool room and placed a bet with a person named Edward Capel. While affirming the convictions, and rejecting the appellant's argument that the Circuit Court should have excluded testimony about conversations that he neither participated in nor overheard, this Court stated:

> The appellant contends that the officers' testimony as to Capel's statement to them, "I got it up," is hearsay, made out of the presence of the accused, and hence inadmissible. We think, however, that it was part of the *res gestae*.... The verbal act of taking a bet, with or without the knowledge or consent of Little, was germane to the charge of maintaining premises for gambling.

*Id.* at 522–23, 105 A.2d at 503.

Telephone calls like the one testified to by Trooper Gussoni have been held to be admissible in an unbroken line of state and federal appellate decisions.[3] Although some commentators have disagreed with the courts' analysis of precisely *why* such testimony is admissible, the commentators have not asserted that the testimony should be excluded. Professors Mueller and Kirkpatrick have stated:

> **Courts often reach the right outcomes, but few opinions penetrate the problem well.** Those that admit such

---

**3.** The state cases include *Best v. State*, 71 Md.App. 422, 526 A.2d 75 (1987). In *Best*, the Circuit Court overruled a "hearsay" objection to a detective's testimony about a drug purchase and sale conversation that he had with a person who called the telephone on the premises being searched, and the Court of Special Appeals affirmed that ruling on the ground that the detective's "testimony was not hearsay at all, but evidence of a verbal act." *Id.* at 432, 526 A.2d at 80.

Most of the federal cases hold that such evidence is an "implied assertion," and that an "implied assertion" is not "hearsay" under Rule 801 of the federal rules of evidence. *See e.g., United States v. Groce*, 682 F.2d 1359, 1364 (11th Cir.1982); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* P801(a)(01) (1988).

evidence sometimes justify the result by saying the behavior is not an assertion or is not offered to prove what the actor/speaker asserted—positions at odds with reality. Here are some examples:

1. *Bets and drug orders.* During searches or raids of drug houses or bookmaking establishments, investigating officers often intercept incoming calls from people trying to place bets or buy drugs. Such calls are usually a mix of act and assertion. The voice on the line might commit the caller to a bet or purchase on certain terms, virtually binding him to perform if the terms are accepted. Or the voice simply make inquiries that convey an interest in doing business, amounting to an attempt to do so or to set something up.

Whether the caller makes a commitment or just tries to make a bet or buy drugs, placing the call is not simply an assertion but action seeking to achieve these ends, and the performative quality of such behavior justifies nonhearsay treatment when it is proved as a means of showing that bets are taken or drugs are sold where the call is received. **Courts admit such evidence in both gambling and drug cases, and this result seems sensible.** In some settings, one might also avoid the hearsay objection by using the incoming calls as proof of the illegal use to which the premises are put, which is tantamount to saying that placing bets and buying drugs (or attempting to do either one) are themselves elements of an offense relating to the premises.

Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence,* § 8.22 at 773 (4th ed. 2009). (Emphasis supplied) (footnotes omitted).

Professor Graham has stated:

[A]ssume 20 policemen accompanied by 20 clergy of various denominations place tape recorders on 40 telephones and record 100 calls each answered by a police officer or clergy and each proceeding something like, "This is Tom, put $2 to win on Acne Pimple in the third at Belmont." While occasionally considered not hearsay as either a state-

ment characterizing an act or as circumstantial evidence not being offered for the truth of the matter asserted but solely for the fact said, the plain and simple fact is that such statements fall clearly within the definition of hearsay. There is no independently relevant act, apart from the statements placing the bets themselves, for the statements to characterize. The statements are irrelevant if offered solely for the fact they were said. For any of the telephone calls to be relevant to establish that the establishment where the 40 telephones were located was a betting parlor, the declarant who placed the telephone call must have intended to call the number reached. Moreover, the declarant must have believed that the number dialed was a betting parlor. In addition, the declarant must have intended to place a bet, instead of, for example, playing a practical joke. Finally, and most importantly, the declarant's intention to place a bet must have been formed in reliance upon previously acquired personal knowledge that the number dialed is in fact a betting parlor. Thus the out-of-court statement placing a bet is relevant only when offered to prove the truth of the matter necessarily implicitly being asserted by the out-of-court declarant, i.e., that the establishment reached is in fact a betting parlor. **As presented such statements also fall within the residual hearsay exception of Rule 807.**

Michael H. Graham, *Evidence, An Introductory Problem Approach* 81 (2002). (Emphasis supplied).

In *United States v. Lewis,* 902 F.2d 1176 (5th Cir.1990), the appellant argued that he was entitled to a new trial on drug trafficking charges on the ground that the United States District Court for the Southern District of Mississippi overruled "hearsay" objections to the following evidence:

At the time of their arrest, each appellant had in his possession an electronic pager or "beeper." These pager were seized by the Ridgeland Police. Later that day, at the police station, the pager associated with Lewis began beeping. Officer Jerry Price called the number displayed on the pager and identified himself as Lewis. The person on the

other end asked Price "Did you get the stuff?" Price answered affirmatively. The unidentified person then asked "Where is Dog?" Price responded that "Dog" was not available. He then tried to arrange a meeting with the unknown caller, but no one showed up at the appointed rendezvous. The evidence at trial revealed that "Dog" is Wade's nickname.

*Id.* at 1179. While affirming the ruling of the district court, the United States Court of Appeals for the Fifth Circuit stated:

The questions asked by the unknown caller, like most questions and inquiries, are not hearsay because they do not, and were not intended to, assert anything. D. Binder, *Hearsay Handbook* § 2.03 (2d. ed. & 1989 supp.); *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 388 (S.D.N.Y.1985).

\* \* \*

Accordingly, we conclude that because the questions asked by the unknown caller were not assertions, the questions were not hearsay, and the district court properly allowed Officer Price to repeat them in his testimony.

*Id.* (Footnotes omitted).

In *United States v. Rodriguez–Lopez*, 565 F.3d 312 (6th Cir.2009), while reversing a district court ruling that excluded a DEA agent's testimony about ten requests to purchase heroin made by persons who called the defendant's cellular telephone shortly after his arrest, the United States Court of Appeals for the Sixth Circuit stated:

Because the district court did not conduct an evidentiary hearing, the record does not reveal exactly what the anonymous callers said to Agent Perryman. We do not even know whether the callers phrased their statements as declarations ("I want some heroin."), questions ("Can I get some heroin?"), or commands ("Bring me some heroin."). But whatever their grammatical mood, the statements are not hearsay because the government does not offer them for

their truth. Indeed, if the statements were questions or commands, they could not—absent some indication that the statements were actually code for something else—be offered for their truth because they would not be assertive speech at all. They would not assert a proposition that could be true or false. *See United States v. Wright*, 343 F.3d 849, 865 (6th Cir.2003) ("[A] question is typically not hearsay because it does not assert the truth or falsity of a fact."); *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir.2006) ("Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay." (citations omitted)). Even if the statements were assertions, the government offers them, not for their truth, but as evidence of the fact that they were made. The fact that Rodriguez received ten successive solicitations for heroin is probative circumstantial evidence of his involvement in a conspiracy to distribute heroin. *See Headley v. Tilghman*, 53 F.3d 472, 477 (2nd Cir.1995) (Questions from an unidentified caller were not admitted for their truth but as circumstantial evidence that the defendant used his beeper to receive requests for drugs).

*Id.* at 314–315.

While there may be an "implied assertion" in almost any question, in the case at bar, the only assertion implied in the anonymous caller's question was the assertion that the caller had the funds to purchase the drugs that he wanted to purchase. Because the caller's request did not constitute inadmissible hearsay evidence, the rule against hearsay does not operate to exclude evidence of the "verbal act" that established a consequential fact: Petitioner was in possession of a telephone called by a person who requested to purchase cocaine.

## II–IV.

■ Petitioner argues that he is entitled to a new trial on the ground that the Circuit Court failed to comply with the requirements of Md. Rule 4–215(a)(3) when responding to

Petitioner's assertion that he did not want Mr. Anderson to represent him. According to Petitioner (in the words of his Petition), "[t]he trial ... proceeded with Mr. Anderson acting in a standby advisory capacity. The docket entry documenting this event reads: 'Court finds defendant has a right to proceed without counsel today and Mr. Anderson may advise.'" While rejecting the argument that Petitioner actually represented himself at trial, the Court of Special Appeals stated:

> The bottom line is that [Mr.] Anderson was never discharged as counsel for the [Petitioner] and that the provisions of Rule 4–215(a)(3), therefore, never came into play.

> Our concern, and the concern of Rule 4–215, is with the fundamental right of a defendant to have the effective assistance of counsel when going to trial in a criminal case. That basic purpose was well expressed by Judge Orth in *Parren v. State,* 309 Md. 260, 281–82, 523 A.2d 597[, 607] (1987):

> > It is perfectly clear that *the purpose of Rule 4–215 is to protect that* most important *fundamental right to the effective assistance of counsel,* which is basic to our adversary system of criminal justice, and which is guaranteed by the federal and Maryland constitutions to every defendant in all criminal prosecutions.

> (Emphasis supplied).

> As we assess whether the [Petitioner] received that constitutionally guaranteed effective assistance of counsel, we will look to what actually took place at [his] trial and not at what looked as if it might take place in the waning moments before the trial began. Although the colloquy at that time was a bit vague, there loomed at least the possibility that [Mr.] Anderson might be discharged and might remain available only in a standby capacity by way of giving legal advice if such advice were to be sought by the pro se defendant. In fact, no such watered down relationship ever asserted itself.

* * *

In this case, it was Mr. Anderson and not the [Petitioner] who "called the shots" from start to finish. Judge Orth described the difference in roles.

> *When a defendant appears pro se, it is he who calls the shots,* albeit, *perhaps, with the aid, advice and allocution of counsel* in the discretion of the trial judge. *When a defendant is represented by counsel, it is counsel who is in charge of the defense* and his say as to strategy and tactics is generally controlling, but again with such participation by the defendant as the trial judge deems appropriate.

309 Md. at 265, 523 A.2d [at 600] (emphasis supplied). In the last analysis, the potential Rule 4–215 problem turns out to have been a non-starter.

183 Md.App. at 132–34, 960 A.2d at 654–655. From our review of the record,[4] we agree with this analysis.[5] Members of the Maryland Bar are officers of the court who have an obligation to comply with the Rules of Professional Conduct. While serving as Petitioner's trial counsel, Rule 1.2 required that Mr. Anderson abide by Petitioner's decision concerning the services to be performed on Petitioner's behalf, and Rule 3.3 prohibited Mr. Anderson from making a false statement to the Circuit Court. When Mr. Anderson stated, **"I'm still in the case[,]"** the Circuit Court was entitled to rely upon that statement and was not required to make any further inquiry.

**JUDGMENT AFFIRMED; PETITIONER TO PAY THE COSTS.**

BELL, C.J., and HARRELL, J., Dissent.

Judge HARRELL authorizes me to state that he joins Part II of this opinion.

---

**4.** It is well settled that if there is a contradiction between the transcript and the docket entries, the transcript controls.

**5.** There is no merit in the argument that a party's "concession" on a matter of law made during a trial court "hearing" is binding on an appellate court.

Dissenting Opinion by BELL, C.J., which HARRELL J. joins as to Part I.

This case presents two issues. First, whether the statement, "Can I get a 40?," made by an unknown declarant in a call to the petitioner's cell phone and intercepted by a police officer, is admissible as non-hearsay, to show that the petitioner was distributing cocaine. As to this issue, the majority holds that this statement is a verbal act, and, therefore, is not hearsay and is admissible. *Garner v. State,* 414 Md. 372, 388, 995 A.2d. 694, 703–04, 2010 WL 1957227 (2010). The second issue is whether, in compliance with Maryland Rule 4–215,[1] the trial court, responding to the petitioner's request to dis-

---

1. Maryland Rule 4–215. "Waiver of counsel." states, in relevant part:

 "(a) First appearance in court without counsel. At the defendant's first appearance in court without counsel, or when the defendant appears in the District Court without counsel, demands a jury trial, and the record does not disclose prior compliance with this section by a judge, the court shall:
 "(1) Make certain that the defendant has received a copy of the charging document containing notice as to the right to counsel.
 "(2) Inform the defendant of the right to counsel and of the importance of assistance of counsel.
 "(3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.
 "(4) Conduct a waiver inquiry pursuant to section (b) of this Rule if the defendant indicates a desire to waive counsel.
 "(5) If trial is to be conducted on a subsequent date, advise the defendant that if the defendant appears for trial without counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel.
 "The clerk shall note compliance with this section in the file or on the docket.

 \* \* \* \* \* \*

 "(c) Discharge of counsel—Waiver. If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant

charge counsel, permitted counsel to be discharged and whether, notwithstanding counsel's subsequent extensive involvement in the conduct of the trial, counsel was, in fact, discharged. Adopting the Court of Special Appeals' rationale, the majority holds that the petitioner's defense counsel " 'was never discharged as counsel ... and that the provisions of Rule 4–215(a)(3), therefore, never came into play.' " *Garner v. State*, 414 Md. at 389, 995 A.2d at 704 (quoting *Garner v. State*, 183 Md.App. 122, 132, 960 A.2d 649, 654 (2008)). I disagree with the majority on both issues, and, accordingly, I dissent.

The facts may be briefly stated. During a routine traffic stop on the afternoon of June 22, 2006, it came to Trooper Jeremy Gussoni's attention that Alphonso Garner, the petitioner, was driving on a suspended license. Having arrested the petitioner for the infraction, the Trooper and his partner searched the petitioner's vehicle. The search "revealed 13 individually wrapped baggies containing what turned out to be [6.9 grams of] cocaine." *Garner*, 183 Md.App. at 126, 960 A.2d at 651. Trooper Gussoni testified that, subsequently, at the police station, the petitioner's cell phone rang and that, when he, Trooper Gussoni, answered it and said "Hello," the caller asked, " 'Can I get a 40?,' but then hung up when Trooper Gussoni asked him for his name." *Id.*

The petitioner was charged in the Circuit Court for Queen Anne's County with, *inter alia,* possession of cocaine, possession with intent to distribute cocaine and, possession of drug paraphernalia. He appeared for trial represented by counsel.

Before the commencement of trial, the following colloquy concerning the petitioner's desire for new counsel, occurred:

"[DEFENSE COUNSEL]: ... For the last couple of days, I've explained to Mr. Garner the nature of the case, the evidence against him. In other words, things that a lawyer

---

unrepresented by counsel if the defendant discharges counsel and does not have new counsel. If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance."

does prior to trial and I had recommended to Mr. Garner a certain disposition in this case, as opposed to going to trial and I have, apparently, done [so] too consistently because Mr. Garner has indicated to me that he doesn't think that I have his best interests at heart with regard to this case. He doesn't think I'm going to try the case wholeheartedly because of my continued assertions that he take a plea in the case.... So I thought I ought to bring that to the Court's attention because I think he was going to stand up and say it....

"THE COURT: ... Mr. Garner, you heard what Mr. Anderson said, do you want to add anything to that?

"THE DEFENDANT: Yes, sir. I feel like he's not going to represent me in my best interests.

"THE COURT: Why didn't you do something about it before now?

"THE DEFENDANT: Because I thought he was going to try to represent me in my best interests, but after a couple days, I done seen that he's not trying to—

"[DEFENSE COUNSEL]: But I told you, I showed you—

"THE DEFENDANT:—and I'm not trying to take a plea. He is trying to force a plea, make me take a plea that I don't want to take."

After assuring the defendant that the court would not make him accept a plea, the trial judge stated:

"THE COURT: Well, then you should have done something about it before. You come in and you ask for postponements and everything else."

The defendant maintained, and his counsel confirmed, that the defendant had not requested the previous postponement. This prompted the following colloquy, the effect and purpose of which was to continue with the proceedings that day:

"THE COURT: Well, anyway, you're not asking for a continuance, you are going to represent yourself, is that what you [would] like?

"THE DEFENDANT: I would love to have a continuance to get me another lawyer because I got a steady job now and I need the continuance to get me a lawyer that I feel that is going to represent me in my best interests, as far as my case is concerned. I have a steady job, might take me a month to get some money to have me another lawyer that I feel I would get the best representation for my behalf on my case."

After refusing to grant a continuance, the trial court continued its colloquy with the petitioner, this time inquiring as to the petitioner's intention with respect to the discharge of counsel:

"THE COURT: I see. Are you going—do you want to discharge him, is that it?

"THE DEFENDANT: Yes, sir.

"THE COURT: All right. Would you like me to have him stay to be—sit next to you at the trial table to be on call if you need his help during the trial? What I'm saying is we are going to have a trial today.

"THE DEFENDANT: Is there any kind of way I can discharge him from representing me?

"THE COURT: I said you can do—you have an absolute right to represent yourself, if you want to. You have an absolute right to get an attorney. You can't wait until the day of trial and come in and tell me that you are going to fire your attorney.

\* \* \*

"THE DEFENDANT: I didn't know who to go to let anybody know, know what I mean, what kind of situation it was. My best interests was to come to the judge that's hearing the case and let him know that I don't—

"THE COURT: I don't have anything to do, you chose the attorney. If you had problems, you had to work it out with him. Mr. Anderson is a member of the bar, I'm sure if you told him what your feelings were, I'm sure he would have done something about it.

"THE DEFENDANT: I have told him.

"THE COURT: What?

"THE DEFENDANT: He can sit there.

"THE COURT: What?

"THE DEFENDANT: He can sit there.

"THE COURT: Okay. Thank you. Go ahead."

Although defense counsel was asked by the trial court to be, and the petitioner agreed that the defense counsel could be, standby counsel, counsel acted as lead counsel throughout the trial.

One of the motions made by the defense counsel was a motion *in limine* to exclude the contents of a phone call to the petitioner's cell phone. He argued:

"[DEFENSE COUNSEL]: . . . my client, apparently, had a cell phone which was answered by a state trooper later in— after he was arrested and the caller on the other end said something ["Can I get a 40?"] that I think would be very damaging to my client in this particular case. I don't think that evidence or that statement should be admitted or the call on the other end of the phone, should be admitted for a couple of reasons.

"Obviously, it's an anonymous call. We don't know who it was from, we don't know if they got the right number and I'm not able, obviously, to cross-examine. I think the reliability of whatever was said on the other end is subject to suspicion and I think the probative value of that would certainly not outweigh the prejudice that it would weigh on my client in this particular case."

In response, the State relying on *Best v. State*, 71 Md.App. 422, 526 A.2d 75 (1987), argued: "it [']s a verbal act. . . . [I]t was offered as evidence that the call was made for the purpose of arranging an illegal drug transaction." The trial court denied the petitioner's motion, without explanation. That denial was error.

In an attempt to establish that "Can I get a 40?," indicated that the call was for drugs, the State called Corporal Michael

with the Maryland State Police Drug Task Enforcement Division. He testified *inter alia:*

"[THE STATE]: Corporal Michael ... are you familiar with cocaine?

"[WITNESS]: Yes.

\* \* \*

"[THE STATE]: Okay.... [T]hrough your training and experience, what increments is cocaine sold in?

"[WITNESS]: Its usually known in money denominations, is the common way it is referred to, such as a 20 rock, a 40 rock, 60, 80 and even as high as an 100 probably for a street.

\* \* \*

"[THE STATE]: Have you, through your training and experience and debriefing individuals, have you heard the term 40 before?

"[WITNESS]: Yes.

"[THE STATE]: Do you have an opinion, to a reasonable degree of certainty, as to what that means?

"[WITNESS]: Forty is a quantity of crack cocaine that is commonly referred to. It's approximately four-tenths of a gram. Just like a 20 is about two-tenths of a gram."

The petitioner was later convicted of the charged offenses and sentenced to 41 years in prison. The Court of Special Appeals affirmed the judgment below. *Garner v. State,* 183 Md.App. 122, 960 A.2d 649 (2008).

I. *"Can I get a 40?" is inadmissible hearsay.*

The majority holds that the statement, "Can I get a 40?," made by a "non-testifying, unnamed caller to Petitioner's cell phone" is admissible. *Garner v. State,* 414 Md. at 375, 995 A.2d at 696. Although acknowledging that this Court has held that implied assertions constitute hearsay, *see Bernadyn v. State,* 390 Md. 1, 10–11, 887 A.2d 602, 607–08 (2005); *Stoddard*

*v. State,* 389 Md. 681, 693, 887 A.2d 564, 571 (2005), and that the statement at issue in this case constituted an implied assertion, *Garner v. State,* 414 Md. at 388, 995 A.2d at 704, but without explanation as to how it arrived at that conclusion, the majority states baldly that, "the only assertion implied in the anonymous caller's question was the assertion that the caller had the funds to purchase the drugs that he wanted to purchase." *Id.* From that premise, the majority concludes:

"Because the caller's request did not constitute inadmissible hearsay evidence, the rule against hearsay does not operate to exclude evidence of the 'verbal act' that established a consequential fact: Petitioner was in possession of a telephone called by a person who requested to purchase cocaine.[2]"

*Id.* To avoid the result *Stoddard* and *Bernadyn* would require, the majority asserts that

"neither *Stoddard* nor *Bernadyn* presented the issue of whether the 'verbal part of an act' is subject to exclusion under the rule against hearsay, or the issue of whether the rule against hearsay is applicable to every out-of-court declaration that constitutes circumstantial evidence of the declarant's state of mind [3]."

*Garner v. State,* 414 Md. at 381, 995 A.2d at 699.

The logic of the majority's reasoning and, therefore, its conclusion escapes me. I, therefore, dissent.

---

**2.** This is intended to be a different rationale and assertion than offered by the State. Under the State's argument, there necessarily was an implied assertion that the call was properly placed, that it was intended for the petitioner, who, it also implies, in answer to the request, would supply the cocaine. The same implied assertions must be indulged under the majority's approach however much it may wish that they did not apply. That a call was placed to a cell phone possessed by a person has resonance only if the person in possession of the phone was the intended recipient of the call and, further, be the source of the drugs requested.

**3.** In a footnote, the majority calls attention to *Connor v. State,* in which this Court held admissible a "dying declaration" even though there was

### A. The rule against hearsay is applicable in this case.

"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c) [4]. Although hearsay is generally inadmissible, *see* Md. Rule 5–802 [5], there are a plethora of exceptions which make hearsay admissible and also instances where a statement may be classified as non-hearsay. Non-hearsay is admissible and not subject to scrutiny under an hearsay analysis.

"The threshold questions when a hearsay objection is raised are (1) whether the declaration at issue is a 'statement,' and (2) whether it is offered for the truth of the matter asserted. If the declaration is not a statement, or if it is not offered for the truth of the matter asserted, it is not hearsay and it will not be excluded under the hearsay rule.

" 'Statement' is defined by Md. Rule 5–801(a) as '(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.' The Rule does not define 'asserted' or 'assertion.' The Committee note to Rule 5–801 explains as follows:

---

no foundation showing that the victim was aware that she was dying. 225 Md. 543, 171 A.2d 699 (1961). The majority proffers that neither *Stoddard* nor *Bernadyn* overruled *Connor*. *Garner v. State*, 414 Md. 372, 381–82, 995 A.2d 694, 699–700, 2010 WL 1957227 (2010). To be sure, neither expressly states that it does; however, it is well settled, indeed, common sense, that later cases inconsistent with earlier ones control the issue as to which there is inconsistency.

**4.** The Maryland Rules governing hearsay were modeled after the Federal Rules. *See generally*, Md. Rule 801 *et seq.* To the extent that they are the "same or similar, often we look to interpretations of the federal rule in construing the Maryland Rule." *Stoddard v. State*, 389 Md. 681, 695, 887 A.2d 564, 572 (2005). Of course, while the "federal court interpretations . . . are considered persuasive, [they] are not binding on this Court." *Id.*

**5.** Rule 5–802. Hearsay rule.
"Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible. "NOTES: Source.—This Rule is derived from F.R.Ev. 802."

" 'This Rule does not attempt to define 'assertion,' a concept best left to development in the case law. The fact that proffered evidence is in the form of a question or something other than a narrative statement, however, does not necessarily preclude its being an assertion. The Rule also does not attempt to define when an assertion, such as a verbal act, is offered for something other than its truth.' "

*Stoddard,* 389 Md. at 688–89, 887 A.2d at 568–69.

The majority categorizes the statement, "Can I have a 40?," as a verbal act, and, therefore, holds that it is admissible as non-hearsay. To be sure, "Can I get a 40?" is indeed an assertion; it is not, however, a verbal act.

According to our jurisprudence and that of our sister jurisdictions, a verbal act is verbiage that describes an action taking place. *See Carozza v. Williams,* 190 Md. 143, 150, 57 A.2d 782, 786 (1948) ("[U]nsatisfactory material by word of mouth, and other statements accompanying, and relating to, the performance of duties or other conduct of business, are not hearsay but are verbal acts and are admissible when relevant. In familiar, but somewhat loose, legal parlance they are part of the *res gestae*[6]—verbal parts of an entire act.");

---

**6.** There has been much confusion and disdain for the term, *res gestae.* Acting Dean and Professor Edmund M. Morgan of the Yale Law School noted:

"[t]he marvelous capacity of a Latin phrase to serve as a substitute for reasoning, and the confusion of thought inevitably accompanying the use of inaccurate terminology, are nowhere better illustrated than in the decisions dealing with the admissibility of evidence as *'res gestae.'* It is probable that this troublesome expression owes its existence and persistence in our law of evidence to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking."

Edmund M. Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229, 229 (1922). In an attempt to classify the subsets under the umbrella term, *res gestae,* Professor Morgan identified seven classes of cases which fell under *res gestae.* They are:

1. Words that constitute an operative fact,
2. Words used as circumstantial evidence of an operative fact,
3. Non-verbal conduct which has a legal effect because of the verbal conduct accompanying it,

*McBriety v. Phillips,* 180 Md. 569, 576, 26 A.2d 400, 404 (1942) ("Under the rule of *res gestae,* conversations of parties in the course of a transaction are admissible when the words are spontaneous and so closely related to the principal transaction as to explain its character. *1 Jones on Evidence in Civil Cases,* 4th Ed., Sec. 358; 6 *Wigmore on Evidence,* 3rd Ed., Sec. 1776; 20 *Am.Jur., Evidence,* Secs. 662, 680. Such utterances, irrespective of their trustworthiness as assertions, are received as verbal parts of the entire act."); *see also Antunes–Salgado v. Florida,* 987 So.2d 222, 226 (Fla. 2nd Dist.Ct.App. 2008) (" 'Verbal acts' are statements made during the course of an act or transaction that explain the nature of the act."). Verbal acts are not offered for the truth of the matter asserted and are, therefore, classified as admissible non-hearsay. *Bowie v. Martin,* 199 Md. 58, 64, 85 A.2d 786, 789 (1952) ("The rule against hearsay is not applicable to 'verbal acts' which may constitute relevant conduct of the parties, *e.g.,* on questions of procuring cause or intent."); *Banks v. State,* 92 Md.App. 422, 432, 608 A.2d 1249, 1254 (1992)("Verbal acts are those 'out-of-court statements [that] are operative legal facts which constitute the basis of a claim, charge or defense ... and are nonhearsay.' L. McLain, 6 Maryland Evidence § 801.7 at 278 (1987) (McLain)"); *see Antunes–Salgado,* 987 So.2d at 226 ("These types of statements are not hearsay

---

4. Non-verbal conduct depends on the intent with which it is done,
5. Declaration of an existing mental condition,
6. Utterance that is contemporaneous with a non-verbal act which sheds light or gives meaning to the event, and
7. State of mind.

*See* Edmund M. Morgan, *Res Gestae,* 12 Wash. L.Rev. 91, 91–100 (1937); Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale. L.J. at 231–38. Cognizant of the complexities involving hearsay and citing to Morgan's formulation, courts began to move away from the all-encompassing term *res gestae.* Instead of relying on *res gestae,* the term was replaced by the actual rule or rules applicable to the utterance. Although the majority, makes general references to verbal acts without specificity, it is important, especially in the hearsay matrix, to be as clear and as exact as possible. With that in mind, verbal acts, as referred to by the majority likely refers to number three (3) of Morgan's classifications. In this class, non-verbal acts are given meaning by the admission of the verbal conduct.

because they are not offered for the truth of the matter asserted but instead are offered to show the effect of the statement on the defendant because that effect has some independent legal significance."). In short, verbal acts, are admissible to show a play-by-play of the ongoing events.

A verbal act references or describes an action that is ongoing or gives rise to further action. It is particularly "relevant because it explains some observed act by the defendant," *id.* at 227, as it relates to the crime charged. That said, there is an important distinction between those cases where the statement is offered to describe the defendant's action or reaction to a statement or circumstances, and cases in which the statement is offered for another purpose. In those instances where the defendant is not directly participating in or responding to an action, the statement may be admissible to explain some relevant act or event, *i.e.,* perhaps to describe how the premises are being used, but it cannot be used to explicate an action—because there is none—of the defendant. Cases involving evidence secured during the raid of a betting or gambling house make this point clear. In these cases, the statements are offered to prove the nature of the activity occurring on the premises, and not to prove the defendant's complicity. Other evidence is needed to make that connection.

In *Courtney v. State,* 187 Md. 1, 2, 48 A.2d 430, 430 (1946), for instance, the defendant was charged with "unlawfully making and selling books or pools on horse races and with keeping a house for the purpose of betting and gambling." The State sought to prove "that the place in question was a gambling place and that some or all of the persons found therein were engaged in taking bets in violation of law." *Id.* at 6, 48 A.2d at 432. The Court in that case makes clear that the evidence at issue was not " 'evidence of a telephone conversation . . . introduced against a particular person,' " *id.,* but the evidence was being introduced to illustrate that the place itself was being used as a criminal enterprise.

Likewise, in *Little v. State,* 204 Md. 518, 520–21, 105 A.2d 501, 502 (1954), two State police officers in Cumberland went

to a pool room operated by Leonard Little. Acting undercover, the officers placed bets on horse races. *Id.* The officers gave money to Edward Capel ("Capel") to secure their bet. *Id.* Capel went into the back room and when he came back, he informed the police that " 'I got it up,' " *id.,* apparently meaning that their bets were made. At trial, Little contended that the "officers' testimony as to Capel's statement to them, 'I got it up' [was] hearsay." *Id.* at 522, 105 A.2d at 503. The Court disagreed, holding:

> "We think, however, that it was part of the *res gestae.* The statement did not purport to repeat anything said to Capel by Little, or even to implicate him directly in the transaction. It merely indicated an acceptance of their offer by Capel, either on his own account or for an undisclosed principal. The verbal act of taking a bet, with or without the knowledge or consent of Little, was *germane to the charge of maintaining premises for gambling.*"

*Id.* at 522–23, 105 A.2d at 503 (emphasis added). In *Little,* the statement was not introduced to implicate the defendant, it was meant to prove the charge of maintaining the premises for gambling.

Where the statement is introduced for the specific purpose of implicating the defendant, it is considered a verbal act only if it describes an action or reaction of or by the defendant. *Stevens v. Florida,* 642 So.2d 828 (Fla. 2nd Dist.Ct.App.1994) is illustrative. There the defendant, Stevens, was found guilty of two counts of delivery of cocaine. The evidence introduced was that of his co-defendant, Hill, who negotiated with an undercover officer for the sale of cocaine, during the course of which he went over to the defendant's, Stevens's car, and yelled " 'I need a dime.' " *Id.* at 829. The officer testified that Stevens "reach[ed] into his pocket ... and grab[ed] a whole bunch of plastic baggies, at which point he gave Mr. Hill one, put the rest back in his pocket, then Mr. Hill came back to me." *Id.* Rejecting Stevens's argument that the statement, " 'I need a dime,' " was inadmissible hearsay, *id.,* the Florida court held:

"Appellant's participation could not have been demonstrated any other way. Since the testimony was not offered for its truth, it is not hearsay.... We, accordingly, affirm appellant's convictions for delivery of cocaine within 1,000 feet of a school and possession of cocaine."

*Id.* In that case, Hill's statement precipitated, and described, the defendant's action.

Where the statement neither explains nor evokes an action or reaction by the defendant, it is just a statement that does not assist the fact-finder in understanding or evaluating the actions of the defendant, and, accordingly, is subject to a hearsay analysis. This point was made in *Antunes–Salgado v. Florida,* which involved a confidential informant ("CI") arranging to buy drugs from a party who was not the defendant. 987 So.2d at 223. "During the cell phone calls that led up to the transaction, Tranquilino [an associate of the defendant] told the CI that other people would be with her at the transaction, but she did not" name the person or persons. *Id.* At the drop-off site, the defendant, Antunes–Salgado, was in the back seat. *Id.* "When the police stormed the truck, they found five kilograms of cocaine." *Id.* The defendant was later charged with trafficking cocaine and conspiracy to traffic cocaine, *id.,* and the statements made to the CI were used to convict him. Reversing the defendant's conviction, the Florida Court of Appeals noted the distinction between hearsay and verbal acts, stating: "[T]he statements at issue are not nonhearsay 'verbal acts.'" *Id.* at 226. The court then went on to explain this distinction:

"Thus, for example, had Tranquilino told the CI that Antunes–Salgado would be accompanying her to the transaction, that statement would have been a 'verbal act' because it would have served to explain Antunes–Salgado's presence in the back seat of the truck and might have established his involvement in the transaction. However, none of the statements actually offered by the State at trial were relevant to

explain any act by *Antunes–Salgado.*[7] Instead, the statements are relevant only to prove the truth of the matter asserted in them; *i.e.,* that Antunes–Salgado had an agreement with the codefendants to deliver cocaine to the CI."
*Id.* at 227. It explained further:

"For example, in *Banks [v. State,* 790 So.2d 1094 (Fla. 2001) ], an undercover police officer was standing at a pay phone when a car driven by Banks approached. 790 So.2d at 1096. Banks' passenger, Goodman, spoke to the officer and asked her what she needed. *Id.* The officer first asked Goodman whether Banks was 'straight up.' *Id.* After Goodman replied that he was, the officer asked Goodman if she could purchase drugs from him. *Id.* Goodman told the officer that it would be no problem. . . . Goodman then sold the officer the drugs. *Id.* Goodman did not testify at trial, and Banks challenged the admission of Goodman's statements as hearsay; however, the trial court admitted the statements.

"On appeal, the supreme court noted that many of the statements Goodman made to the officer arranging the drug sale and arranging to meet in the alley appeared to be admissible as 'verbal acts' because those statements explained Banks' conduct in driving the car into the alley after the initial encounter. *Id.* at 1099 n. 3. That conduct had independent legal significance because it implicated Banks in the transaction. *Id.* However, the statement that Banks was 'straight up' was not a verbal act because it did not explain the nature of the act or transaction but rather simply implicated Banks in the transaction.[8] *Id.* at 1098.

---

**7.** Similarly the anonymous call at issue here did not identify the defendant by name or explain any ongoing or future action. There is, in fact, absolutely nothing about this call that would differentiate it from a wrong number.

**8.** Additionally, the *Banks v. Florida* court, notes that when a statement does not "explain the nature of the act or transaction, but rather . . . implicate[s]" the defendant, it is not a verbal act. 790 So.2d 1094, 1098 (Fla.2001). This is consistent with both *Courtney v. State,* 187 Md. 1, 6, 48 A.2d 430, 432 (1946), and *Little v. State,* which pointed out that

Therefore, the statement directly incriminating Banks was not a verbal act and was not admissible. *Id.*"

987 So.2d at 227. *Antunes–Salgado* and *Banks* show that verbal acts are restricted to those statements which describe an action or reaction by the defendant and not those that are introduced for the purpose of "directly incriminating" the defendant. *Id.* (quoting *Banks v. Florida,* 790 So.2d at 1098).

In this case, the phone call, and, in particular its content, did not describe or explain any action on the defendant's part. In fact, the defendant was not even present and may not have been aware of the call at all. He was detained and, therefore, unavailable to take the phone call.

An additional concern is the anonymity of the caller and the actual behavior of the caller. Defense counsel specifically stated: ". . . it's an anonymous call. We don't know who it was from, we don't know if they got the right number and I'm not able, obviously, to cross-examine." Notably this call was less meaningful than a conversation with an unidentified person. Here, not only was the caller unidentified, but, unlike many of the cases below, the caller did not ask to speak to anyone when the officer picked up the phone. *Contra Court-ney,* 187 Md. at 3–4, 48 A.2d. at 431 ("During the period of an hour various persons call[ed]. . . . some of the callers asked for Nick, others for Nat."). The declarant, rather, after asking one question, ambiguous without expert testimony, hung up the phone when asked to identify himself. As the defense counsel argued, it is not at all clear whether the declarant even meant to call the petitioner. Indeed, in truth, the declarant's behavior is not at all inconsistent with that of an individual who calls the wrong number and hangs up when he or she realizes that the wrong number was dialed.

Nevertheless, the call was offered against the petitioner. Although it is contended that its purpose was a benign one, to show that such a call was made to a phone that the petitioner

---

the "statement did not purport . . . to implicate" the defendant "directly in the transaction." 204 Md. 518, 523, 105 A.2d 501, 503 (1954). That is, however, exactly what the statement is being offered for here.

possessed, that proposition alone would not further the State's case and, in fact, merely that the call was made, without more, would not tie the petitioner to the sale of cocaine. In truth, its only effect, if not its purpose, was to prove that the petitioner was distributing cocaine. Thus, the statement was assertive and highly prejudicial.

By this holding, any question posed by an unidentified caller to a cell phone belonging to a defendant, but in police control, even if it does not explain an action or reaction by the defendant, and whose only purpose and effect is to implicate the defendant in a criminal act, constitutes a verbal act admissible without regard to its prejudicial effect or analysis pursuant to Rule 5–801. This turns the concept of verbal act on its head and undermines the hearsay rule.

 B. Why "Can I get a 40?," is inadmissible hearsay.

Having established that this case falls squarely within the rule against hearsay, I return to the statement itself and the majority's conclusion that it "established a consequential fact: "Petitioner was in possession of a telephone called by a person who requested to purchase cocaine." *Garner v. State*, 414 Md. at 388, 995 A.2d at 704. To be sure, the statement does tend to establish that fact, but that fact has meaning and probative force only if the assertions it implies—that the owner of the cell phone is the owner of, and will sell, the cocaine the caller wants to purchase—are true. Thus, the statement by the declarant is in violation of our rule against hearsay.

The hearsay rule excludes statements of non-testifying individuals offered in court to prove the matter they assert. Md. Rule 5–801(c). Although "[m]uch verbal evidence may be sorted into hearsay and non-hearsay without too [much] searching," *Stoddard*, 389 Md. at 689, 887 A.2d at 569, not all cases are so simple. A statement is considered hearsay when the assertion it implies "is relevant only in that, by asking it, [the declarant] may have revealed, by implication, a belief that," *id.*, implicates the defendant. "The implied assertions

doctrine focuses on the implications or inferences contained within or drawn from an utterance, as distinguished from the declaration's literal contents." *Id.* at 690, 887 A.2d at 569–70.

In *Stoddard,* the defendant, "was convicted of second degree murder and child abuse resulting" in the death of Calen DiRubbo. 389 Md. at 683, 887 A.2d at 565. The evidence showed that "Stoddard was the only adult supervising Calen," and "her cousin Jasmine Pritchett." *Id.* at 684, 887 A.2d at 566. Jennifer Pritchett, Jasmine's mother, testified over the objection of defense counsel, that Jasmine, after the incident, "asked [her mother] if Erik was going to get her." *Id.* at 685, 887 A.2d at 566. The State offered "this utterance as evidence that the child had witnessed Stoddard commit the murder," *id.* at 683, 887 A.2d at 565, prompting the defendant to argue that the statement was inadmissible hearsay. *Id.* at 686–87, 887 A.2d at 567. The question presented to the Court was "whether the trial court erred in admitting testimony recounting an out-of-court utterance allegedly made by a non-testifying eighteen month old child." *Id.* at 683, 887 A.2d at 565. We answered in the affirmative, applying the implied assertion doctrine. *Id.* at 711–12, 887 A.2d at 581–82.

In a section of the *Stoddard* decision, entitled, "Other Courts in Accord with Our View," we cited to several cases in support of our conclusion that the admission of implied assertions cannot be considered apart from the subject's literal contents: *United States v. Palma–Ruedas,* 121 F.3d 841, 857 (3d Cir.1997) ("While Quinones may not have offered the statement for its express meaning, he did offer it for the implied assertion that he had never met Avendano."); *Lyle v. Koehler,* 720 F.2d 426 (6th Cir.1983); *United States v. Reynolds,* 715 F.2d 99 (3d Cir.1983); *Iowa v. Dullard,* 668 N.W.2d 585, 594–95 (Iowa 2003) ("[W]e do not believe indirect or unintentional assertions in speech are reliable enough to avoid the hearsay rule. We think the best approach is to evaluate the relevant assertion in the context of the purpose for which the evidence is offered."); *Ginyard v. United States,* 816 A.2d 21, 40 (D.C.2003); *Mosley v. Texas,* 141 S.W.3d 816, 829

(Tex.Ct.App.2004); *Brown v. Virginia,* 25 Va.App. 171, 487 S.E.2d 248, 252 (1997).

In *Reynolds,* to prove a conspiracy between the defendant and a co-defendant, postal inspectors testified that, after Reynolds's arrest, he told the defendant, " 'I didn't tell them anything about you.' " 715 F.2d at 100–101. We reported, with approval, the holding of the United States Court of Appeals for the Third Circuit, that the evidence was hearsay:

" 'Reynolds' statement is ... ambiguous and susceptible to different interpretations. As the government uses it, the statement's probative value depends on the truth of an assumed fact it implies. Unless the trier assumes that the statement implies that Reynolds did not tell the postal inspectors that Parran was involved in the conspiracy to defraud, even though Parran was in fact involved, the statement carries no probative weight for the government's case. For if the trier assumes that the statement implied that Reynolds did not tell the postal inspectors that Parran was involved because there was nothing to tell, the statement has no relevance to the government's case.

" 'Its only relevance to the government's case is tied to an assumed fact of petitioner's guilt that the government argues the utterance proves. Thus, depending on the interpretation given the content of Reynolds' statement, it is either probative or not. Consequently, we believe that, as the government uses it, the statement's relevance goes well beyond the fact that it was uttered. It is not merely intended to prove that Reynolds could speak, or that he could speak in English, or even that he directed a statement toward Parran. Instead, the government offers it to prove the truth of the assumed fact of defendant's guilt implied by its content.' "

*Stoddard,* 389 Md. at 704–05, 887 A.2d at 578 (quoting *Reynolds,* 715 F.2d at 103).

In *Lyle,* letters outlining the testimony, Kemp, the co-defendant wrote for two potential witnesses to give at trial written, *id.* at 429, were admitted against the defendant at his

murder trial. Explicating the court's analysis in reversing his conviction for violation of the hearsay rule, this Court stated:

"The court found these letters to be hearsay, stating as follows:

" 'Believing the alibi to be false, the prosecution obviously did not seek to introduce the letters in order to demonstrate the truth of the particular statements they contained. Rather, the government intended to have the jury infer from the statements that Kemp was attempting to obtain fabricated alibi testimony, an act that revealed a 'guilty mind' on his part regarding the shootings. This guilty mind inference in turn invited the jury to infer Kemp's substantive guilt. Thus, in determining whether the letters constitute hearsay, we must decide whether the inferences that the government sought to elicit by introducing them should be included within the set of 'assertions' that the letters make."

\* \* \*

" 'Although we consider the question of the proper classification of the letters exceedingly close, we find that the inferences they necessarily invite form an integral part of the letters. They were introduced because by inference they assert the proposition of fact that Kemp and Lyle committed the robbery and hence need an alibi. Accordingly, we conclude that the letters are hearsay.' [*Lyle*, 720 F.2d] at 432–33 (citations omitted).' "

*Stoddard*, 389 Md. at 706–07, 887 A.2d at 579. Having set the foundation for what an implied assertion looks like and the manner in which this Court classifies it, the *Stoddard* Court turned to the facts before it and Jasmine's statement, "is Erik going to get me," noting:

"Contrary to the State's contention, the words are not relevant if offered merely to prove that Jasmine was afraid of Stoddard. Jasmine's fear of Stoddard is irrelevant unless it stems from a belief that she had seen Stoddard assault Calen. Although it is conceivable that Jasmine's fear, taken

together with her presence during the relevant time frame, was circumstantial evidence that Jasmine witnessed Stoddard assault Calen, this conceptualization is a distinction without a difference. Jasmine's fear of Stoddard is relevant only if it is rational, *i.e.*, only if it stems from a real-world condition or event. To rationally fear Erik Stoddard is to believe the proposition, 'I have a reason to fear Erik Stoddard.' Jasmine's belief in this proposition is relevant only if the 'reason' at issue is her having witnessed Erik assaulting Calen. Thus, in offering Jasmine's fear as evidence, the State implicitly would be offering Jasmine's belief in the proposition 'I have a reason to fear Erik Stoddard and that reason is that I saw him assault Calen.' "

*Id.* at 690, 887 A.2d at 569. It further explicated:

"In order to accept the words 'is Erik going to get me' as evidence that Jasmine witnessed Erik Stoddard assaulting Calen DiRubbo, the jury needed to make numerous inferences. It needed to infer first that Jasmine meant those words to convey a sincere inquiry as to whether Erik Stoddard was going to harm her. It needed to infer next that, by making this inquiry, Jasmine revealed unambiguously a belief that she had witnessed Stoddard assaulting Calen. It needed to infer further that Jasmine remembered accurately her perceptions of June 15, 2002. And it needed to infer finally that Jasmine's perceptions were correct at the moment she experienced them.

"In the absence of cross-examination, and particularly in light of Jasmine's age [9], these inferences are largely untest-

---

**9.** Notably, one of the reasons the *Stoddard* Court ruled the way it did was Jasmine's unreliability as a witness; she was unable to testify and "particularly in light of Jasmine's age." *Stoddard*, 389 Md. at 711, 887 A.2d at 582. Although concerns about the declarant's age have not been raised, as mentioned above the declarant is unknown. Less information about the declarant in this case is known than was not known by the *Stoddard* Court about Jasmine, the declarant in that case. What is clear is that the jury had no background information about the declarant, no evidence to suggest or confirm that he called the right number, no reason to speculate as to the declarant's mental fitness to "remember ... past events" or more important, no evidence from

ed and unsupportable. The jury had no information about the context in which Jasmine spoke these words, and hence little basis from which to conclude that she used 'get' to mean 'harm,' or that these words were spoken seriously and not in play. The jury had no information about other, unrelated reasons why Jasmine might have feared Stoddard. It had no information about Jasmine's ability to remember accurately past events, nor any information about the amount of time that had elapsed between Calen's death and Jasmine's utterance. It had no information about factors that would have affected Jasmine's perceptions during the alleged assault, such as distance, angle of view, obstructions, or Jasmine's cognitive ability to distinguish an assault from some other frightening but innocuous event."

*Id.* at 711–12, 887 A.2d at 582. (footnote omitted).

The ruling of the *Stoddard* Court was affirmed in *Bernadyn v. State,* 390 Md. at 11, 887 A.2d at 608 ("Our discussion and reasoning in *Stoddard* determines the outcome of this case."). In *Bernadyn,* defendant, Michael Bernadyn, was charged with and convicted of various drug offenses and maintaining a common nuisance. 390 Md. at 3, 887 A.2d at 603. Bernadyn asserted at trial that he did not reside at the home where, during the execution of a search and seizure warrant, the contraband and paraphernalia where found. *Id.* at 4, 887 A.2d at 604. To rebut that assertion, the State offered, over objection of defense counsel, an envelope, which also had been seized from the home during the search, from John Hopkins Bayview Physicians, which "contain[ed] the language 'Responsible party: Michael Bernadyn, Jr. 2024 Morgan Street, Edgewood, Maryland 21040.'" *Id.* at 4, 887 A.2d at 603–604. Concluding that "the medical bill seized by police ... when used by the State to establish that Bernadyn lived at that address, constitutes inadmissible hearsay," *id.* at 3, 887 A.2d at 603, the Court reasoned:

---

which to conclude that the declarant "spoke[ ] seriously and not in play." *See Id.* at 711–12, 887 A.2d at 582.

"In order to accept the words 'Michael Bernadyn, Jr., 2024 Morgan Street, Edgewood, Maryland 21040' as proof that Bernadyn lived at that address, the jury needed to reach two conclusions. It needed to conclude, first, that Bayview Physicians wrote those words because it believed Bernadyn to live at that address, and second, that Bayview Physicians was accurate in that belief. As used, the probative value of the words depended on Bayview Physicians having communicated the proposition that Michael Bernadyn lived at 2024 Morgan Street. The words therefore constituted a 'written assertion'—and hence, under Md. Rule 5–801(a), a 'statement'—that Michael Bernadyn lived at 2024 Morgan Street."

*Id.* at 11, 887 A.2d at 608. It, therefore, concluded:

"When used to prove the truth of that assertion, the bill was hearsay under Md. Rule 5–801(c), because it contained 'a statement . . . offered in evidence to prove the truth of the matter asserted.' "

*Id.*

This Court is not unique in its view that implied assertions are inadmissible hearsay. *See Lyle v. Koehler*, 720 F.2d 426; *United States v. Reynolds*, 715 F.2d 99; *Antunes–Salgado v. Florida*, 987 So.2d at 228; *United States v. Palma–Ruedas*, 121 F.3d at 857 ("While Quinones may not have offered the statement for its express meaning, he did offer it for the implied assertion that he had never met Avendano."); *Stevens v. State*, 642 So.2d 828. In *United States v. McGlory*, 968 F.2d 309 (3d Cir.1992), the United States Court of Appeals for the Third Circuit, on review of four consolidated drug-related cases, *id.* at 314, addressed a similar issue when four defendants "objected to the admission of the notes seized from McGlory's trash or his residences." *Id.* at 331. Although the government asserted "the notes were offered as circumstantial evidence," *id.* at 332, similar to the majority in this case, *Garner v. State*, 414 Md. at 380–82, 995 A.2d at 699–700, the court was not persuaded. From the outset, the court expressed that it "has disfavored the admission of statements

which are not technically admitted for the truth of the matter asserted, whenever the matter asserted, without regard to its truth value, implies that the defendant is guilty of the crime charged." *McGlory,* 968 F.2d at 332. The court concluded that the State's witness did "testif[y] as to the truth of the statements written on the notes," *id.* at 333, and that, therefore "these notes were hearsay and should not have been admitted unless they come within one of the exceptions to the hearsay rule." *Id.*

*Stoddard v. State* and *Bernadyn v. State,* control the disposition of this case. When "[t]he probative value of the words [are] depend[ent]," *Bernadyn,* 390 Md. at 11, 887 A.2d at 608, on the truth of facts implied by the statement, it is inadmissable hearsay. The caller here posed a question: "Can I get a 40?" Whether that question is offered for the truth of the matter it asserts, expressly or impliedly, is, of course, dependent upon the meaning, express or implied, it conveys or was intended to convey. If certain "implications or inferences" are necessary to be made or drawn in order that the statement be probative of the proposition for which it is offered, then the "reasonable test is to ask whether the words would remain probative if it could be established that the declarant *did not believe* the factual proposition for which they are offered." *Stoddard,* 389 Md. at 703 n. 5, 887 A.2d at 577 n. 5.

Here, the State intended, by introduction of the question, "Can I get a 40?" to show that the petitioner was distributing cocaine. The statement alone does not have that effect. To be probative of that proposition, which it had to prove for the distribution prosecution to be successful, the statement had to relate to, be directed to, the petitioner. In addition to establishing that a "request[ ] to purchase cocaine," *Garner v. State,* 414 Md. at 388, 995 A.2d at 704, was made, the State first had to show that the statement was directed to the petitioner and that the petitioner sold cocaine. These "facts" could only be established by implying them from the fact that the declarant made the statement in a call to the petitioner's cell phone and the implications must be accepted as true. Only by believing both implied facts to be true does the statement, "Can I get a

40?" have the meaning and probative effect that the State intends, and needs. "Can I get a 40?," without those two assumptions, implied facts, even with the expert testimony that gives it meaning in the criminal context, would have no connection or relevance to the petitioner. Using the test proposed by the *Stoddard* Court, 389 Md. at 703 n. 5, 887 A.2d at 577 n. 5, if the declarant, the caller, did not believe those two assumptions to be true, then the State would have no reason to introduce the statement; the statement, in that event, as it relates to the petitioner, simply would be neither probative nor relevant.

The State intended to, and did indeed, introduce the statement for a particular purpose, to establish that the person on the phone wanted cocaine, which could be purchased upon request from the petitioner, who sold, or was selling, drugs. The latter two implied assertions are, when offered for their truth, hearsay, whose admission into evidence is inconsistent with this Court's previous holdings in *Stoddard* and *Bernadyn*, respectively, and impermissible under Md. Rule 5–801(c).

## II. *Waiver of Counsel*

The petitioner asserts that, although the trial court permitted him to discharge his counsel, albeit after having found that he did not have a meritorious reason for doing so,[10] thus requiring him to go to trial unrepresented, it failed to comply

---

**10.** Maryland Rule 4–215(e) contemplates that counsel may be discharged whether or not the defendant has a meritorious reason for doing so. There is a price to pay for discharging counsel without a meritorious reason: there will be no continuance of the trial and the defendant will, therefore, be required to go to trial unrepresented; he or she would have to represent him or herself. If there is a meritorious reason to discharge counsel, the court is required to continue the case. The Rule then provides: "If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance." *See* Md. Rule 4–215(e). It is this provision that is at issue. There may be some interesting issues with respect to how this provision applies when the discharge of counsel is for a non-meritorious reason; however, we do not reach them in this case, as the only issue decided, and even argued, was whether counsel was discharged.

with Md. Rule 4–215(e)'s mandate that "it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance." The State, in response, argues that counsel was never discharged. The majority agrees, holding, as did the Court of Special Appeals: " 'The bottom line is that [Mr.] Anderson was never discharged as counsel for the [Petitioner] and that the provisions of Rule 4–215(a)(3), therefore, never came into play.' " *Garner v. State*, 414 Md. at 389, 995 A.2d at 704 (quoting *Garner*, 183 Md.App. at 132, 960 A.2d at 654).

This holding is belied by the transcript of the proceedings and by the docket entries. The transcript reflects that the petitioner responded, "yes, sir," in response to the trial court's question: "Are you going—do you want to discharge him, is that it?" To the petitioner's affirmative response, the court stated:

"All right. Would you like me to have him stay to be—sit next to you at the trial table to be on call if you need his help during the trial? What I'm saying is we are going to have a trial today."

Thus, the petitioner indicated a desire to discharge his counsel, and, although the petitioner eventually acquiesced [11] in the

---

**11.** The transcript, thereafter, reflects the following colloquy:

"THE DEFENDANT: Is there any kind of way I can discharge him from representing me?

"THE COURT: I said you can do—you have an absolute right to represent yourself, if you want to. You have an absolute right to get an attorney. You can't wait until the day of trial and come in and tell me that you are going to fire your attorney.

\* \* \*

"THE DEFENDANT: I didn't know who to go to let anybody know, know what I mean, what kind of situation it was. My best interests was to come to the judge that's hearing the case and let him know that I don't—

"THE COURT: I don't have anything to do, you chose the attorney. If you had problems, you had to work it out with him. Mr. Anderson is a member of the bar, I'm sure if you told him what your feelings were, I'm sure he would have done something about it.

"THE DEFENDANT: I have told him.

"THE COURT: What?

"THE DEFENDANT: He can sit there.

court's suggestion that counsel "stay to be—sit next to [him] at the trial table . . . if [he] need[ed] help during the trial[,]" the trial court permitted him to do so. The docket entry so reflects: "Defendant wants to discharge attorney and requests continuance. Court finds defendant has right to proceed without counsel today and Mr. Anderson may advise."

The majority's conclusion that Anderson was never discharged also runs contrary to this Court's understanding of what standby counsel is. Standby counsel, we have held, "assist[s] a defendant's exercise of the right of self-representation, and . . . assist[s] 'the court in maintaining some measure of control over the proceeding.' " *Harris v. State*, 344 Md. 497, 506, 687 A.2d 970, 974 (1997). This is consistent with the view of such counsel taken by the United States Supreme Court. It described standby counsel as one who aids "the accused if and when the accused requests help, and [is] available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Faretta v. California*, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562, 581 n. 46.

*Harris v. State*, 344 Md. 497, 687 A.2d 970 is instructive. Although the issue in *Harris* was whether the trial court could order the Office of the Public Defender to serve as standby counsel after the defendant had voluntarily and knowingly discharged counsel, *id.* at 499, 687 A.2d at 971, the manner in which the Court talks about standby counsel provides guidance on this issue. In *Harris*, the defendant in the underlying case, Bruce W. Koenig, wished to discharge his counsel. He specifically asked to " 'proceed as I wanted to, in what [counsel] described as a [ 'hybrid defense.' " *Id.* at 501 n. 2, 687 A.2d at 972 n. 2. The *Harris* Court, citing *Parren v. State*, 309 Md. 260, 265, 523 A.2d, 597, 599 (1987), explained hybrid representation as:

---

"THE COURT: What?
"THE DEFENDANT: He can sit there.
"THE COURT: Okay. Thank you. Go ahead."

" 'encompassing both the participation of the defendant in the conduct of the trial when he had not effectively waived the assistance of an attorney to defend him, and the participation by an attorney in the conduct of the trial when the defendant was proceeding *pro se*.' "

*Harris*, 344 Md. at 501 n. 2, 687 A.2d at 972 n. 2. Accordingly, the trial court explained to the defendant that hybrid representation is not a recognized type of representation in Maryland, given that " 'there are only two types of representation constitutionally guaranteed—representation by counsel and representation *pro se*—and they are mutually exclusive.' " *Id.* (quoting *Parren*, 309 Md. at 265, 523 A.2d at 599). While the defendant "persisted in his intention to discharge counsel," *Harris*, 344 Md. at 501, 687 A.2d at 972, he also requested the trial court to "appoint standby counsel—'someone who would sit with him, provide him legal advice,' " *id.* at 501–02, 687 A.2d at 972, although the defendant, himself, " 'would drive the case,' " *id.* at 502, 687 A.2d at 972, and " 'determine what [is] to be done.' " *Id.* In order to provide the defendant standby counsel, the trial court made a finding that "Koenig's 'motion to discharge counsel is freely, voluntarily and understandingly made' and that he 'knowingly and intelligently' elected to represent himself, 'with the assistance of standby counsel.' " *Id.* The trial court then "issued an order striking counsel's appearance as counsel for Koenig, but directing OPD to provide standby counsel for Koenig." *Id.*

In order for a lawyer, who once represented the defendant, to serve as his or her standby counsel, the trial court must first discharge the lawyer as counsel. Once discharged, the lawyer is no longer the defendant's attorney; the lawyer remains in the case only for the purpose of assisting the defendant as he or she needs it. *Parren* and its progeny make clear that, when a defendant has been afforded the opportunity to have standby counsel, the defendant remains the "captain of the ship." *Parren*, 309 Md. at 264, 523 A.2d at 599. Given this Court's firm and consistent stance that "the right to counsel and the right to defend *pro se* cannot be

asserted simultaneously," *id.*, counsel's discharge is a prerequisite to the lawyer later serving as standby counsel.

Here, Anderson was discharged. The trial court then asked the petitioner if he "would . . . like" Anderson to "stay . . . sit next to [him] at the trial table to be on call if [the petitioner] need[ed] [Anderson's] help during the trial." The petitioner maintained that he wanted to discharge Anderson, stating: "Is there any kind of way I can discharge him from representing me?" After the trial court assured him that he could, but made clear to the petitioner that the trial would continue, and he would have to represent himself, the petitioner acquiesced and permitted Anderson to serve as standby counsel, stating "[Anderson] can sit there." The Court responded: "Okay. Thank you. Go ahead." As indicated, and as we have seen, the docket entries support the discharge, with Anderson as stand-by counsel.

It is true that, immediately upon discharging counsel, Anderson assumed control of the case and the petitioner did not object. That the petitioner may have permitted counsel to seize control has relevance with regard to the petitioner's right, subsequently, to complain about the decisions counsel may have made in his behalf; it has absolutely no relevance on the issue of whether the trial court failed to meet its responsibility to comply with the Rules.

Judge HARRELL joins in the views expressed in Part I of this dissenting opinion.